(No. 70407.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROLANDO CRUZ, Appellant.

*Opinion filed July 14, 1994.*

316

NICKELS, J., concurring.
HEIPLE, J., joined by BILANDIC, C.J., dissenting.
McMORROW, J., dissenting.

Lawrence C. Marshall, of Mayer, Brown & Platt, of Chicago, and John J. Hanlon, Assistant Defender, of the Office of the State Appellate Defender, of Springfield (Anne D. Samuels and Constantine L. Trela, Jr., of Sidley & Austin, Susan Valentine and Fay Clayton, of Robinson, Curley & Clayton, Jeffrey H. Winick, of Stein, Ray & Conway, and Carol C. Dillard, of Peterson & Ross, all of Chicago, of counsel), for appellant.

Roland W. Burris, Attorney General, of Springfield, and James E. Ryan, State's Attorney, of Wheaton (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen, Steven J. Zick, Bradley P. Halloran and Michael M. Glick, Assistant Attorneys General, of Chicago, Barbara A. Preiner and Margaret M. O'Connell, Assistant State's Attorneys, of counsel, and Joan M. Dillon, law student), for the People.

Michael B. Metnick, of Metnick, Barewin & Wise, of Springfield, Jeffrey Urdangen, of Chicago, and Jane Raley, of Evanston, for amicus curiae Alejandro Hernandez.

Michael A. Mello, of South Royalton, Vermont, for amici curiae Hugo Adam Bedau and Michael L. Radelet.

Roger Pascal and Paul E. Dengel, of Schiff, Hardin & Waite, of Chicago, for amici curiae Peter Beckwith et al.

Lowell E. Sachnoff, of Sachnoff & Weaver, Ltd., of

Chicago (Stuart J. Chanen and Mary N. Cameli, of counsel), for *amici curiae* The Chicago Conference of Black Lawyers *et al.*

Edward M. Genson, of Genson, Steinback & Gillespie, and Michael D. Monico, of Monico, Pavich & Spevack, all of Chicago, for *amici curiae* The National Association of Criminal Defense Lawyers and Illinois Attorneys for Criminal Justice.

Ruben Castillo, of Kirkland & Ellis, of Chicago, for *amici curiae* Six Deans of Illinois Law Schools.

Sheldon T. Zenner, of Katten, Muchin & Zavis, of Chicago, for *amici curiae* James B. Burns *et al.*

JUSTICE FREEMAN delivered the judgment of the court:

In 1985, defendant, Rolando Cruz, and codefendant Alejandro Hernandez were tried together, convicted of the kidnapping, rape and murder of Jeanine Nicarico and sentenced to death. The jury was unable to reach a verdict on identical charges against another codefendant, Steven Buckley. Defendant Cruz's convictions were reversed, and his case was remanded for a new trial (*People v. Cruz* (1988), 121 Ill. 2d 321). Hernandez's convictions were also reversed, and his case was remanded for a new trial (*People v. Hernandez* (1988), 121 Ill. 2d 293). The jury was unable to reach a verdict on identical charges against Buckley.

Following a second jury trial in the circuit court of Du Page County, defendant was again convicted of murder, aggravated kidnapping, deviate sexual assault, aggravated indecent liberties, and residential burglary (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (a)(2), 10—2(a)(2), (a)(3), 11—3(a), 11—4(a), 19—3(a)), and again sentenced to death (Ill. Rev. Stat. 1981, ch. 38, par. 9—1).

Defendant's death sentence was stayed (134 Ill. 2d R. 609(a)), pending direct review by this court (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603). On initial review, a majority of this court affirmed defendant's convictions and death sentence; three members dissented. Defendant petitioned for rehearing, and we allowed the filing of supporting *amicus curiae* briefs submitted by religious leaders, various local and national bar associations, deans from Illinois law schools, several individual legal scholars, and a grouping of former State and Federal prosecutors. We subsequently granted defendant's petition for rehearing (134 Ill. 2d R. 367) and reconsidered the case. Preliminarily, we grant the State's motion to supplement the record on appeal with the testimony of George Mueller, Brian Dugan's former counsel, given at the trial of codefendant Alejandro Hernandez. We also grant the defendant's motion to file *instanter* his response to the State's motion to supplement the record. Based on findings of significant trial error, we now reverse and remand for retrial.

The sad facts of this case are well known and adequately recounted in *Cruz*, 121 Ill. 2d 321, and *Hernandez*, 121 Ill. 2d 293. In sum, on the afternoon of February 25, 1983, 10-year-old Jeanine Nicarico was kidnapped from her family's Naperville home, raped and bludgeoned to death. Her body was found several days later in underbrush on the Illinois Prairie Path, near Eola Road, south of Illinois Route 5 in Naperville. The coroner determined that Jeanine had died within several hours after her abduction as the result of several severe blows to the head. She was also blindfolded with a towel which was secured by adhesive cloth tape wound several times around her head. Her body additionally evidenced a broken nose, minor post-mortem scratch marks on the legs, and vaginal and anal sexual assault.

On March 14, 1983, Du Page County sheriff's police questioned Alejandro Hernandez based on an anonymous tip that he might have information about Jeanine's murder. Near the end of April 1983, after speaking with other acquaintances of Hernandez and defendant, police began a series of discussions with defendant about the murder. Defendant was among several persons who were then attempting to provide police with information about the murder following the public offering of a $10,000 reward. During this time, defendant was in periodic contact with authorities investigating the murder. On March 9, 1984, on the basis of several statements made to police and various witnesses, defendant was arrested and charged with Jeanine Nicarico's murder.

The State's evidence was largely testimonial, consisting of statements made by defendant to law enforcement officials, friends, or fellow inmates. Dan Fowler, a convicted felon, testified that, in the spring of 1983, he and defendant were drinking beer one evening, celebrating defendant's birthday, when defendant related that he knew the four or five persons who were involved in the Nicarico murder. Defendant said that he had been "involved with it, *** but didn't kill the girl." Defendant told Fowler that he knew where the bat, the murder weapon, was, and then he began crying. Fowler reportedly wanted to go retrieve the weapon and turn it in, but defendant said "no." Following the conversation, defendant and Fowler drove to the home of someone defendant wished to see. Fowler identified the son of the Nicaricos' former housekeeper from a photo as the person they had visited.

The defense impeached Fowler with evidence showing that he had testified inconsistently before the grand jury. This evidence revealed that, before the grand jury, Fowler initially testified that defendant told him defendant knew who was involved in the case, and that de-

fendant planned to testify against them. Following a noon recess, Fowler testified that defendant told him that defendant, himself, had been at the murder scene. Fowler was further impeached by Thomas Laz, defendant's former counsel, who testified that Fowler had once explained to him that, during the noon recess, a prosecutor threatened to charge Fowler with perjury. Fowler then told the grand jury, after the recess, what he believed the prosecutor wanted him to say. According to Laz, Fowler related that he gave the truthful testimony before the noon recess.

Stephen Ford, a fellow inmate with defendant in the Du Page County jail, testified that defendant told him that he had "kind of killed" a girl in Aurora. According to Ford, defendant related that he had been living in the woods in Aurora, but "something" had happened and he had to get out of the area. Defendant also reportedly said that he had left something "stashed" there. Ford was impeached, however, with his testimony from defendant's first trial, which was that he was unsure about defendant's statement to him. According to Ford, he gave this earlier testimony because defendant had threatened to kill him. Ford denied receiving any preferential sentencing in return for his testimony, yet he conceded that he had received two five-year concurrent sentences for two burglary charges and numerous other burglary charges were "possibly" dropped less than two weeks after he reported his conversation with defendant to authorities.

Du Page County Sheriff's Detectives Vosburgh and Kurzawa testified that on May 2, 1983, they took a tape-recorded statement from defendant. Defendant told them that Ray Ortega, a friend, had told him that Alex Hernandez had taken a little girl from a house in Naperville during a home invasion and that the girl had been hurt, so Hernandez had decided to "finish it."

According to defendant, someone named "White Boy" had arranged the home invasion. Vosburgh and Kurzawa testified that they spoke with Ortega the next day. Their testimonies reveal that no substantial evidence was gained.

Vosburgh testified that on May 9, 1983, he picked up defendant at his home and drove him to the sheriff's office. Defendant related that he "knew too much" and was being "shot at" by Hernandez and his friends. Defendant told the detectives that he had had a dream that a young girl had been dragged from the house in a blanket, anally raped, and either struck over the head or on the back of the head with sufficient force to leave an impression in the ground, and dumped near a field. According to the detectives, defendant appeared upset and distraught during this conversation, repeatedly saying, "Tell me it isn't so." At the time, photos of the victim and the crime scene were visible on a nearby table. Defendant could not look at the crime scene photo. The two officers did not tape-record defendant's "dream" statement, nor did they make a written report of the statement. They communicated with prosecutor Thomas Knight that same evening, who told them that a recorded statement would not be necessary because defendant would soon testify before the grand jury. Because defendant said he feared for his life, the detectives allowed him to spend the night at the sheriff's station for his protection. Parenthetically, we note that pretrial discovery did not reveal the existence of defendant's "dream" statement until shortly before trial and that Deputy John Sam, who worked alongside Kurzawa and Vosburgh during the course of the investigation, also testified that he never heard mention of defendant's "dream" statement during that time.

Kurzawa additionally testified that on the morning of May 10, after sleeping at the police station, defendant

gave another statement which police tape-recorded. Defendant related that a short time before the alleged shooting, he had been approached by Hernandez, who had indicated to defendant, by pointing to defendant's head, where the girl had been struck. Defendant related that Hernandez had said defendant "knew too much" and asked defendant "[w]hat good is a dead Chinaman," Chinaman being defendant's street name. Defendant also related an obviously untrue, detailed story about Hernandez, Ortega, and Emilio Donatlan killing the girl with a baseball bat at Donatlan's house. This story, however, contained some facts which were concededly consistent with the ongoing murder investigation, including that the victim had a broken nose and was perhaps struck on the head with a baseball bat. According to the later testimony of Assistant State's Attorney Thomas Knight, some of the facts consistent with the murder investigation were thought by authorities not to have been released to the public, notably that the victim's nose had been broken. According to Kurzawa, police obtained a warrant and subsequently searched Donatlan's home, but did not find any evidence corroborating defendant's statement. At no point in this May 10 statement did defendant mention or repeat his previous "dream statement."

Erma Rodriguez, defendant's cousin, was also called by the State and testified that she saw defendant on Easter Sunday, 1983, and one week earlier when he visited her home. Rodriguez testified that, on Easter, defendant was in his car with a man whose face Rodriguez had not seen. The State attempted to impeach Rodriguez by asking her whether she had previously told Du Page County Sheriff's Detective Warren Wilkosz and Ramon Mares, Rodriguez's cousin, that this man was Brian Dugan. Rodriguez adamantly denied making the statement. Rodriguez also denied telling Wilkosz that

defendant's first visit had occurred several weeks before Easter. The State called Mares and Wilkosz in further impeachment of Rodriguez.

Mares testified that Rodriguez had previously told him that Dugan was in the car with defendant on Easter Sunday. Mares also testified that he, himself, had had a conversation with defendant in March 1983, in which defendant claimed to know who had killed the "little girl." The defense impeached Mares with prior inconsistent statements to Wilkosz and the grand jury, in which he claimed that, in this conversation, defendant admitted to also having been present when the girl was killed. Mares admitted that he had lied before the grand jury because assistant State's Attorneys had "scared" him into testifying by threatening to bring perjury and contempt charges against him. He had also hoped to receive all or part of the $10,000 reward.

Detective Wilkosz testified that he interviewed Rodriguez one week before trial and she identified Dugan as the person with defendant on Easter Sunday. Wilkosz also testified that Rodriguez told him that defendant had come to her home "several weeks" before Easter at 2 a.m., was upset and crying, saying he was in trouble, and requested that she mail a letter to his mother in Texas.

Lieutenant Robert L. Winkler, a watch commander at the Du Page County jail, testified that on March 13, 1984, shortly after being arrested, defendant told him that Hernandez and Stephen Buckley (formerly a codefendant) had asked him to participate in a burglary. Defendant related that he declined their offer. Defendant also related that the pair asked to borrow his car for the burglary, but he did not want them to use it, so he found an older-model, green Lincoln Continental, "hotwired" it, and gave it to them. A few days later, Hernandez telephoned defendant to ask whether he wanted to have

sex with a little girl. Reportedly, defendant declined, saying "he was not into that sort of thing." Winkler acknowledged that he had made no record of his conversation with defendant. Under cross-examination, Winkler also conceded that, at defendant's first trial, he had not mentioned a green Lincoln auto and had testified that defendant said that he showed Hernandez and Buckley how to "hotwire" a car.

Thomas L. Knight, a former Du Page County assistant State's Attorney, testified that he told Detective Kurzawa and Lieutenant Winkler not to document the statements defendant made to them on May 9, 1983, and March 13, 1984. According to Knight, he told Kurzawa he need not tape-record defendant's May 9 statement because defendant would soon be questioned when he appeared before the grand jury and a verbatim statement could be taken. Knight testified that he told Winkler he need not write up defendant's statement because Knight was in the process of summarizing all of defendant's statements for discovery and he would include it in his summary. Knight also recounted defendant's testimony before the grand jury, in which defendant told of his several interactions with Donatlan, Ortega, Hernandez, and Joe Sanchez in order to obtain information for police about the murder.

According to Knight, defendant testified before the grand jury that Ortega and Sanchez had discussed home invasions in Naperville. Defendant testified that Ortega once told him about someone named "White Boy" who was doing home invasions in Naperville. Sanchez once told defendant that Ortega was afraid to go back to Naperville with Hernandez after they had done the last burglary. Sanchez also expressed to defendant that he knew "too much." Defendant also testified that Ortega as well as Hernandez claimed to defendant that Hernandez had killed the girl because Hernandez believed

he was going to get charged with her murder anyway. Defendant also testified that he discussed with Hernandez doing home invasions in Naperville. According to defendant, Hernandez had indicated to defendant where on the head the girl was hit. Defendant also testified about a conversation he had with Donatlan wherein they discussed the Naperville girl. According to Knight, defendant testified to the same story he had given Kurzawa about the girl being killed at Donatlan's house, and added that Hernandez had disposed of the girl's body.

Knight additionally testified that defendant had first told the grand jury that he was working at Oasis Whirlpool on February 25, 1983. Defendant later testified that he had spent the day and evening of February 25, 1983, with friends "getting high."

On cross-examination, Knight agreed that defendant had "spun a story" about Ortega and Sanchez. Knight also admitted that he had not questioned defendant about defendant's "dream" statement before the grand jury.

William Jahnke, president of Oasis Industries, formerly Oasis Whirlpool, testified that although defendant had worked for him for a short time, he had not been employed by Oasis on February 25, 1983.

Steven Pecoraro, another fellow inmate with defendant in the Du Page County jail, testified that in November 1984, defendant told him that defendant, Hernandez and Buckley broke into a house in Naperville, found a little girl and then took her to an abandoned drug dealer's house in Aurora. Defendant related that Buckley and Hernandez took the girl upstairs and defendant heard her screaming because Hernandez was sexually assaulting her. Supposedly, the girl also fell down some wooden stairs, became unconscious, was dragged up by her feet, and defendant heard her

screaming again. Pecoraro testified that defendant related that the girl was killed because she could identify him. Pecoraro testified that defendant commented that he had walked around in the mud in the back of the house and did not understand why police had taken only Buckley's shoes for inspection. Pecoraro also testified that in February 1985, he heard defendant say that he was going to write a book about "how to kill little girls, or five ways to crush a skull." Defendant then started singing "Ooh, little Jeanine." According to Pecoraro, defendant's statements had upset him so much that he mailed a letter to the State's Attorney. Evidence of Pecoraro's convictions and psychiatric treatment was admitted, but evidence that his offenses involved the theft of human body parts, including genitalia, was excluded. Notably, the State did not contend during this trial that Buckley was involved in the Nicarico murder.

A significant difference between the State's case at defendant's first trial and this second trial was the testimony offered by Robert Turner, a convicted murderer and sex offender, housed with defendant in the condemned unit at Menard Correctional Facility, awaiting resentencing. Turner testified that he had spoken with defendant on several occasions in the prison yard, during the warm months of 1987, and defendant had on one occasion admitted that defendant, Hernandez and "someone named Dugan" killed Jeanine Nicarico. According to Turner, defendant told him that the trio burglarized a home, found a girl inside, took her in the back seat of a car to a lightly wooded area, raped her, and then killed her outside the car by hitting her on the head with a crowbar. Some months later, Turner wrote a letter to the Attorney General stating that he had information about eight death row inmates' cases, including defendant's. Turner wrote, "[T]hese people have told me what happened in their cases, although

most of them will not get a new trial, but one may never know." Assistant State's Attorneys then contacted Turner. At the time, Turner's appeal was pending.

Turner admitted under cross-examination that he had decided to write the letter after reading a Chicago Lawyer article, asserting defendant's innocence, which had made him angry. Turner denied knowing anything about defendant's case before speaking with him. Turner also denied telling other death row inmates John Pecoraro (unrelated to Steve Pecoraro) and Richard Nitz that he knew of a way to "get time" (obtain a natural life sentence) by finding out some facts about a case and then fabricating additional information. Turner agreed that, on his resentencing, he would like the judge to be aware that he had cooperated in defendant's case. Turner denied, however, being offered any promises of leniency in exchange for testimony. Turner testified that Assistant State's Attorney Robert Kilander had never said anything to him about providing favorable testimony at Turner's resentencing hearing.

The State also introduced certain physical evidence, including that: a small amount of blood was found on and around the Prairie Path; there was an impression found in the mud about two feet from the victim's head; several parallel markings resembling small hand imprints were found along the walls of the Nicarico home near the front door; a shoeprint was located on the front door of the Nicarico home; two distinctly different shoeprints were found outside the Nicarico home near a window (after defendant's trial, one of the prints was revealed to be a woman's size six print); a tire impression was found in the grass along the curb in front of the Nicarico home, inside of which was a shoe impression, and another tire mark was on the curb. Seminal fluid recovered from the victim's body was DNA tested, excluding both of defendant's previous codefen-

dants Alex Hernandez and Steven Buckley as possible sources, but not defendant or Brian Dugan, an individual convicted of several other sexual assaults and murders of young females, who indicated he alone killed Jeanine Nicarico. The State did not, however, introduce physical evidence linking defendant to the crime. Handprints recovered from the Nicarico home did not match those of the defendant and none of the four shoeprints or impressions found on or near the home were proven to have been made by defendant.

Lieutenant E. Stephen Tornfeather Towns-end of the Lake County sheriff's department, the trainer of the canine unit, testified about the actions of two of his bloodhounds during the police investigation conducted around the Nicarico home. According to Towns-end, his dogs trailed two different paths when directed to scent from Jeanine's bedsheets, the footprint on the front door, and the shoe impression in the tire mark located in the grass.

The defense presented the testimonies of Richard Nitz and John Pecoraro in rebuttal to Turner's testimony. Like Turner, both men are convicted murderers housed in the condemned unit at Menard Correctional Facility. Both testified that during the summer of 1989, Turner told them that he knew of a way to get off death row. Nitz testified that Turner advised finding out a little information about a case through research and conversations, then putting a "little twist" on it, and sending a letter to prosecutors in the particular county to make a deal. The testimony of both men, however, was inconsistent with respect to the circumstances of their conversations with Turner.

Defendant was convicted, substantially on the basis of this evidence.

On appeal, defendant supplements the record with additional authority consisting of this court's opinion in

*People v. Turner* (1993), 156 Ill. 2d 354. *Turner* concerns our disposition of Robert Turner's appeal of his resentencing. Turner was awaiting this resentencing when he testified at defendant's trial. Our opinion refers to the fact that Assistant State's Attorney Robert Kilander testified in behalf of Turner at his resentencing hearing. Specifically, Kilander testified that Turner had "voluntarily provided testimony in the trial of Rolando Cruz" and was cooperative, posing no problem during transport for defendant's trial. On cross-examination, Kilander testified that, "before testifying in the Cruz case, [Turner] wanted to make certain that Kilander would testify on [Turner's] behalf at [Turner's] resentencing hearing." Kilander further testified that "[Turner] appeared to him to be a 'calculating individual, a person that thinks things out.' " (*Turner*, 156 Ill. 2d at 363.) We believe this additional authority clearly impugns Turner's testimony at defendant's trial concerning any agreement he might have made with the State.

## Issues

Defendant raises numerous issues on appeal, including the propriety of several evidentiary rulings and the sufficiency of the evidence. We need only consider whether the trial court abused its discretion in: (1) excluding exculpatory evidence concerning a nontestifying third party's admitted crimes and the circumstances of his confessions to those crimes; (2) permitting the State to impeach its witness and rely on the resulting impeachment evidence in closing argument; and (3) admitting evidence of bloodhound trailing; we also consider (4) whether guilt was found beyond reasonable doubt. Additionally we must address several issues likely to recur on retrial: whether evidence concerning a witness' other crimes and evidence concerning the prosecution's changed theory of the murder site were properly excluded.

Standard of Review

Evidentiary rulings are within the sound discretion of the trial court and will not be disturbed on review unless the trial court has abused its discretion. *People v. Boclair* (1989), 129 Ill. 2d 458, 476; *People v. Bowel* (1986), 111 Ill. 2d 58, 68; see also *People v. Illgen* (1991), 145 Ill. 2d 353, 364.

I.

Admissibility of Evidence Concerning Dugan's Other Crimes

Defendant argues that the trial court erred in excluding evidence concerning Dugan's other crimes and that his accepted confessions to those crimes were contemporaneous with his Nicarico statements. According to defendant, the other-crimes evidence provided by Dugan's confessions as well as the circumstances of those confessions lent credence to Dugan's Nicarico statements that he alone killed Nicarico. The State initially argues that the trial court should not have admitted Dugan's Nicarico statements in the first instance. Had the trial court properly ruled that Dugan's Nicarico statements were inadmissible, argues the State, there would have been no need for the court to consider any evidence corroborating those statements. According to the State, Dugan's Nicarico statements constituted inadmissible hearsay because they were not statements against his penal interest. We preliminarily note that the State has not cross-appealed from the trial court's ruling which admitted Dugan's Nicarico statements. Thus, we consider any factor relating to the admissibility of Dugan's Nicarico statements only to the extent that it is raised by the State's counterargument of this issue.

A.

*Background to Brian Dugan's Nicarico Statements and His Confessions to Other Crimes*

In 1985, while defendant's first appeal was pending,

Brian Dugan was arrested in La Salle County in connection with the kidnapping, rape and murder of eight-year-old Melissa Ackerman. In June, shortly after Dugan's arrest, police from Du Page County attempted to speak with Dugan about the Nicarico murder, but Dugan refused. Sometime in September or October 1985, however, Dugan began authorizing his attorney to convey to La Salle County prosecutors that he was responsible for the murders of Ackerman, Donna Schnorr and an unidentified person in Du Page County.

Dugan told La Salle County prosecutors, through his attorney, that he would confess to these murders and other offenses he had committed if he could obtain a plea agreement for a life sentence in the Ackerman case. At the time, Dugan was a suspect in the Schnorr murder, but he had not yet been charged with that crime. A La Salle County prosecutor subsequently deduced that the Du Page County murder referred to by Dugan was that of the Nicarico child. The prosecutor told Dugan that he knew it was the Nicarico murder and that he planned to contact Du Page County authorities.

On November 13, 1985, Du Page County prosecutors met with Dugan's attorney to discuss Dugan's knowledge of the Nicarico murder. Dugan authorized his counsel to convey to the prosecutors that he had killed Jeanine Nicarico and was prepared to plead guilty to the offense in exchange for their commitment not to seek the death penalty. The prosecutors apparently did not accept Dugan's proposal, later terming the discussions as "fruitless."

On November 16, 1985, in accordance with previous discussions, Dugan confessed to the Ackerman and Schnorr sexual assaults and murders, two other sexual assaults and an attempted abduction. As part of this plea agreement, Dugan agreed to answer truthfully po-

lice questions about the Nicarico murder and another murder in McHenry County which Dugan denied committing. The La Salle and Kane County State's Attorneys expressed satisfaction that Dugan was responsible for the crimes and agreed to accept Dugan's guilty pleas. Dugan stated that he wanted to "clear the books" regarding the only other murder he had committed and did not want to see two innocent persons executed. Because no Du Page County authorities were present to discuss any possible plea agreement, Dugan gave a statement, couched hypothetically and initially related through his attorney, to Illinois Department of Criminal Investigation (DCI) officers that he had abducted, raped and murdered Jeanine Nicarico. All present were aware that Dugan's statement concerned the actual Nicarico crime. In the course of the interview, Dugan began directly relating information to the DCI officers and drew sketches of the crime site.

Dugan's essential Nicarico statement was that he was driving around in his green Plymouth Volare, smoking marijuana, and found himself in the area of Naperville. He stopped at the home of an elderly woman and borrowed and returned a screwdriver because he was having car problems. His car continued to have problems and he approached the Nicarico home to borrow another screwdriver. When he observed Jeanine through a window in the door and became aware that she was alone, he kicked the door open and entered. He indicated that he grabbed the child, secured her hands in some fashion, maybe her feet, obtained tape from his car, maybe moved his car in the driveway, returned to the home, blindfolded the child with the tape and a towel, gagged her, wrapped her in a bed sheet and abducted her after placing her in his car (witnesses' accounts differ as to whether Dugan said he put her in the front seat or the back seat). According to Dugan, he

then drove to the wooded Prairie Path where he untied her, made her get in the back seat, maybe had forcible oral sex, and completed anal rape of the victim (witnesses' accounts differ concerning whether Dugan said he attempted vaginal intercourse). Dugan affirmed that he was "high" on marijuana at the time. Dugan indicated that, once outside the car, he struck the child several times on the head with a tire iron, she hit her head on the car as she fell, and he dragged her body to an area with bushes, then struck her again with a fallen tree branch. According to Dugan, he left the tree branch at the scene, but took the tire iron. Dugan's several Nicarico statements varied somewhat and contained inconsistencies, but not more than other evidentiary statements properly admitted in this case.

On November 19, 1985, Dugan was found guilty of Ackerman's kidnapping, rape and murder, the several sexual assaults and was sentenced to life with a consecutive term of years. On that same date, Dugan was also found guilty of Schnorr's kidnapping, rape and murder and sentenced to a second life term.

Within the next few weeks, Dugan made a series of statements, through his attorney, to DCI officers concerning the Nicarico murder. The officers had been asked by Du Page County prosecutors to obtain additional information. Essentially, these statements supplemented Dugan's previous Nicarico statements by providing additional details about the crime. Dugan also spoke directly to a polygraph examiner and gave a complete statement concerning the Nicarico murder. Dugan provided information about the circumstances of the murder itself, volunteered his secretor type, related that he was observed in his green Volare automobile near the murder site by "utility" workers, that he had asked an elderly woman living in the vicinity of the Nicarico home for a screwdriver to fix his car shortly

before the crime, that he had missed work the day of the crime, and that fibers on the towel he used to blindfold Jeanine could be traced by police to the trunk of his mother's boyfriend's car. Dugan also participated in a drive-around with police to locate the Nicarico home and the Prairie Path, and submitted to polygraph examination and hypnosis.

Throughout these discussions, Dugan made statements about the Nicarico murder on the condition that they could not be used as evidence against him. No assistant State's Attorneys, however, were involved in these discussions which occurred after Dugan was convicted and sentenced for the murders of Ackerman and Schnorr. Dugan provided information about the crime in the belief that he could obtain a third life sentence for Nicarico's murder, which term he was willing to accept. Dugan's defense counsel believed that unless deals were made for all of Dugan's crimes, Dugan had "some exposure." On at least one occasion, Dugan's counsel requested that police convey the information to the Du Page County authorities. Dugan never engaged these authorities in any further plea discussions about the Nicarico crime.

Prior to defendant's trial, the State filed a motion *in limine* to exclude Dugan's Nicarico statements. The trial court first determined as a matter of law that Dugan's Nicarico statements were against his penal interest and therefore met a threshold requirement for admissibility as a hearsay exception. The trial court then conducted a three-week long evidentiary hearing to determine whether there were additional indicia of the statements' trustworthiness to warrant their admission. (See *Chambers v. Mississippi* (1973), 410 U.S. 284, 302, 35 L. Ed. 2d 297, 313, 93 S. Ct. 1038, 1049.) More than 30 live witnesses testified and the stipulated testimony of 15 additional witnesses was also introduced.

Incidentally, we note that the dissenters urge us to conduct a *de novo* review of the evidence offered at this hearing. However, the State did not contend on appeal that this evidence was insufficiently corroborative of Dugan's Nicarico statements. The State only contends, with respect to the admissibility of Dugan's statements, that the statements were not against his penal interest. The State's challenge on appeal of the trial court's ruling admitting the evidence is therefore limited to that extent. In doing so, the State apparently conceded at that time that the evidence was corroborative of Dugan's Nicarico statements, despite the dissenters' present imaginative characterization of it. However, to the extent that the dissenters and the State's brief in opposition to rehearing now argue the matter, we believe it appropriate to present these additional facts. Nonetheless, while presenting the evidence in some detail, we do not decide whether the trial court abused its discretion to the extent that it found the evidence to be sufficiently corroborative. We confine our review to the issues presented on appeal. Moreover, even were we to engage in such a determination, our review could not be a *de novo* review of the evidence as is suggested by the dissenters' review. In short, the State did not appeal the trial judge's ruling that this evidence was sufficiently corroborative, nor could we properly second-guess that determination were we to consider that ruling. We present this evidence to indicate merely what was before the trial court.

During the course of the hearing, significant aspects of Dugan's Nicarico statements were corroborated by the evidence. First, Dugan's account showed basic familiarity with the Nicarico home. While there existed minor discrepancies in Dugan's description of specific details of the home, Dugan's account was, nonetheless, generally accurate, considering the circumstances of his

purported presence there. Dugan's description of the home's floor plan was accurate (stairs near front door, leading to below-ground recreation room; nearby stairs leading to upstairs bedrooms; wooden railing on stairs). Dugan was also able to describe certain features of the Nicarico home: he recounted correctly that there was a brown dresser in Jeanine's bedroom; that there was beige-colored carpeting in the lower recreation room and on the stairs leading down to the room; that the entry way flooring was parquet-like; that the television in the lower recreation room was set apart from other furnishings in the room; that colors in the home were light; that certain doors opened in particular directions; that the bed on which he threw the victim was unmade. (Jeanine's sister testified that she had not made the bed that morning, but had simply covered it with a spread.)

Dugan also suggested to police investigators that they conduct a drive around for him to locate the Nicarico home and the Prairie Path. During the drive around, Dugan was able to provide detailed and accurate directions to the home as well as to the vicinity of the Prairie Path. Notably, regardless of any mailbox name or street sign identifiers of either the home or the Prairie Path, Dugan demonstrated an awareness of where the home and murder site were actually located. Dugan provided directions to as well as identified those sites. The evidence shows, for example, that during the drive around, after looking for the screwdriver lady's home, police asked Dugan to specifically locate the Nicarico home. Dugan replied that they had already driven past it. He then correctly directed the driver to take several turns. According to the agent, at that point "[w]e were still westbound approaching Clover Street, and he stated something to the effect that it is the next street, turn left, it should be the second house on the left." Upon locating the Nicarico home during the drive around,

Dugan also correctly recognized that there had been certain changes made to the home's exterior since the time of the murder.

There were also several facts introduced which served to corroborate Dugan's Nicarico statements. Dugan's work records revealed that he missed work the day of the murder; the shoeprint appearing on the front door of the Nicarico home was made by a right foot which kicked the door twice, just as Dugan had related. The print was also consistent in size and type with Dugan's shoes at the time. Perhaps most corroborative was the fact that a police investigation of the cloth tape used to wrap the victim's head, which was conducted after Dugan made his statements, revealed the tape to be exactly as he had described it in detail: three-fourths to one inch wide, several feet long, with serrated edges and sold packaged in a metal container at the time of the murder. (By the time of the statement, the tape was no longer packaged in metal.) Although not nearly as significant, evidence was also introduced that Dugan's repossessed auto was missing a tire jack, the instrument he had identified as the murder weapon.

Witnesses also testified that they saw a person similar to Dugan on the Prairie Path on the afternoon of the murder. According to Dugan's Nicarico statements, he was observed with his green 1980 Plymouth Volare auto on the Prairie Path around the time of the murder by two "utility" workers. According to a prior owner, as well as a subsequent police investigator, Dugan's auto was missing one hubcap. Evidence was presented during the hearing that, on the afternoon of the murder, two tollway workers observed a male Caucasian in his late twenties in a green car with a missing hubcap in the vicinity of the Prairie Path. The testimony was conflicting, however, in terms of the exact type and color of vehicle (green or dark-green, Plymouth Volare or Ford

Granada), and the exact time of the encounter (2:45, 2:30, or 3:15 p.m.). One of the workers unequivocally testified, too, that Dugan was not the man he had observed. The other worker testified that Dugan's Volare could have been the vehicle he saw. There were also discrepancies surrounding whether Dugan and the person observed exited the vehicle or whether the vehicle was stuck in the mud. However, it was also determined that a tire impression discovered by police on the Prairie Path was made by a Goodyear "Viva" tire, a particular type of tire issued as original equipment on the 1980 Plymouth Volare, but not on the Ford Granada.

Eloise Suk, a worker in a church located several blocks from the Nicarico home, testified that Dugan came into the church during the afternoon of the murder, asked about a job application, and wrote down his name and phone number. Suk's testimony concerning the exact time of the visit has varied; however, the time frame consistently remains sometime between 1:10 and 2:23 p.m. Suk consistently testified that the day of Dugan's visit was a Friday. United States Department of the Treasury Agent Thomas Fischer, the person to whom Suk reported this incident, testified that Suk referred to the day as a Friday, but in testifying, Fischer, himself, apparently mentioned the wrong date, February 23 rather than February 25. According to Suk, she later recalled Dugan's visit both because she recognized that his name was Irish and thought his spelling of it was uncommon; and because, as a cartoonist, she paid attention to facial physiognomy. Although Dugan has never mentioned visiting the church that afternoon, Lauren Fessler and Kelly Fessler, Suk's daughter and son-in-law, both testified that Suk reported the visit to them several days after it occurred and that Suk raised it again following Dugan's arrest in the

Melissa Ackerman murder, well before Dugan became publicly associated with the Nicarico murder. This fact is true as well in the case of Suk's report to Fischer on September 15, 1985.

Other aspects of Dugan's statements were shown to be inconsistent, including, *inter alia*, that he did not see a 22-foot sailboat in the Nicarico driveway, did not see a pet, believed there was a chain on the front door, was unsure about whether the stairs leading to the Nicarico upstairs bedrooms were to the right or the left, was incorrect about a small nightstand in Jeanine's bedroom, was equivocal about what happened to the tire iron, and was inconsistent in his description of the house of the elderly woman from whom he borrowed the screwdriver or how many persons were there. In this regard, the trial court did not have evidence before it concerning two of the several inconsistencies pointed out by the dissenters. Neither is this evidence now properly before this court. The statement attributed to Suk which appeared in the Chicago Lawyer article, referred to by the dissenters (162 Ill. 2d at 410), was not introduced into evidence; neither was the written statement by Dugan referring to defendant and Hernandez as "baby killers" introduced (162 Ill. 2d at 414). Based on the evidence properly before it, the trial court concluded, however, that there existed "sufficient corroborating circumstances" to justify the admission into evidence of Dugan's Nicarico statements under the against-penal-interest exception to the hearsay rule (see *People v. Bowel* (1986), 111 Ill. 2d 58, 66).

Dugan's Nicarico statements were introduced at defendant's trial through the testimony of police officers and Dugan's attorneys. The defense sought to similarly introduce the facts of Dugan's other admitted crimes and that he confessed to them contemporaneous with his Nicarico statements. The evidence concerning Dugan's five admitted assaults was as follows:

1. On June 2, 1985, around noon, Dugan, while driving around alone in his car, smoking marijuana, noticed Melissa Ackerman, an eight-year-old Caucasian girl and her eight-year-old female playmate riding bicycles in Somanauk, La Salle County. Dugan approached, ostensibly to ask for directions, and then grabbed and threw them in his auto. Ackerman's playmate escaped from the car and Dugan drove off with Ackerman. Dugan made Ackerman sit on the front, passenger-side floor of the car and covered her with a sleeping bag. He drove to a wooded area, tied Ackerman's hands behind her back, and anally sexually assaulted her. Dugan drowned Ackerman in a nearby creek and then attempted to hide her body under rocks.

2. On July 15, 1984, Dugan was driving alone in his car in Aurora and noticed Donna Schnorr, a 27-year-old Caucasian female, driving her car. Dugan followed her to a remote stretch of road in Kane County and forced her car off the road. Dugan struggled with Schnorr, tied her hands behind her back and drove her in his car to a secluded water-filled gravel pit. He then forced her to engage in sexual intercourse and oral sex. Dugan killed Schnorr by blunt trauma to the head and drowning.

3. On May 6, 1985, Dugan was driving alone in his car, in the early morning and followed a 21-year-old Caucasian female, also driving a car, to her home in North Aurora, Kane County. He approached her on foot as she sat in her parked car, engaged her in conversation, forcibly entered her car, and produced a knife. Dugan gagged her, took her into his car and blindfolded her. He then drove to a nearby secluded area and sexually assaulted her in the back seat of his auto. Dugan drove her to her residence parking lot and released her after telling her his name and where he went to high school. She later identified Dugan in a lineup.

4. On May 28, 1985, in the late afternoon, Dugan was driving alone in his car and approached a 19-year-old Caucasian woman, walking along a State highway in Geneva, Kane County. Dugan attempted to force the woman into his car, but she escaped. She later identified Dugan in a lineup.

5. On May 29, 1985, Dugan was driving alone in his car

and approached a 16-year-old Caucasian girl as she walked along a street in Aurora, Kane County, in the early evening. Dugan forced her into the front floor passenger area of his car, placed a blanket over her and threatened her with a tire iron. He drove to a remote area in rural Will County, took her from the car by a belt around her neck, removed her clothing, removed his, and sexually assaulted her. Dugan then drove her to her home and released her after telling her his name and where he went to high school. Police later recovered the belt from the area of the assault. The victim identified Dugan in a lineup.

The trial court ruled that this evidence was inadmissible under a theory of *modus operandi*. The jury was allowed to hear only that Dugan had been convicted of several sexual assaults and the murders of Ackerman and Schnorr.

## B.
### *Admission of Dugan's Nicarico Statements as Statements Against Penal Interest*

The State initially argues that Dugan's Nicarico statements were not against penal interest, were therefore not admissible, and there is thus no need to consider the admissibility of additional evidence of Dugan's other crimes. As stated previously, the State did not challenge on appeal the admission of Dugan's Nicarico statements on any other basis. Thus, we do not consider the appropriateness of the trial court's finding that Dugan's Nicarico statements were sufficiently corroborated. Given the record before us, we are satisfied the trial court's finding was in full compliance with the standards relied upon in *People v. Bowel* (1986), 111 Ill. 2d 58, 68.

An extrajudicial declaration not under oath, by the declarant, that he, and not the defendant on trial, committed the crime is inadmissible as hearsay, though the declaration is against the declarant's penal interest.

(*People v. House* (1990), 141 Ill. 2d 323, 389-90; *Bowel*, 111 Ill. 2d at 66.) Such declaration may, however, be admitted where justice requires. (*House*, 141 Ill. 2d at 390; *Bowel*, 111 Ill. 2d at 66, citing *People v. Lettrich* (1952), 413 Ill. 172, 179.) Thus, where there are sufficient indicia of trustworthiness of such extrajudicial statements, a declaration may be admissible under the statements-against-penal-interest exception to the hearsay rule. *Bowel*, 111 Ill. 2d at 66, citing *Chambers v. Mississippi* (1973), 410 U.S. 284, 302, 35 L. Ed. 2d 297, 313, 93 S. Ct. 1038, 1049.

The *Chambers* court referred to four specific objective indicia of trustworthiness: (1) the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) the statement was corroborated by other evidence; (3) the statement was self-incriminating and against the declarant's interest; and (4) there was adequate opportunity for cross-examination of the declarant. (*Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49.) The presence of all four factors is not a condition of admissibility. "They are indicia, not hard and fast requirements." (*House*, 141 Ill. 2d at 390, citing *Bowel*, 111 Ill. 2d at 67.) The question to be considered in deciding the admissibility of such an extrajudicial declaration is whether it was made under circumstances which provide "considerable assurance" of its reliability by objective indicia of trustworthiness. *Bowel*, 111 Ill. 2d at 67, quoting *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49; *People v. Tate* (1981), 87 Ill. 2d 134, 143-44.

The State's sole argument on appeal concerning Dugan's Nicarico statements is that they were not against his penal interest and should not have been admitted for that reason. According to the State, Dugan's Nicarico statements were made in plea negotia-

tions and therefore the statements were not admissible against him in any prosecution for the instant crime. (See 134 Ill. 2d R. 402(f) (plea discussion, agreement, plea, or judgment is not admissible against defendant in any criminal proceeding).) The State further asserts that Dugan already faced natural life sentencing for the murders of Ackerman and Schnorr and gave the Nicarico statements knowing that he could suffer no additional penalty in making them.

Whether Dugan's Nicarico statements were admissible as evidence in a prosecution against him is not alone determinative of whether they were against his penal interest. To say that Dugan's statements were not against his penal interest because he made them so that they could not be used as evidence against him misapprehends the necessary analysis. Actually, the very fact that a defendant under Rule 402(f) is protected from the evidentiary use of his plea-related statements, except as a basis for a guilty plea, reflects that such statements are considered generally to be against a defendant's interest. *Cf. United States v. Scopo* (2d Cir. 1988), 861 F.2d 339 (third party's allocution in entering guilty pleas admissible as statement against interest); *United States v. Gotti* (E.D.N.Y. 1986), 641 F. Supp. 283 (defendant and third parties' pleas and allocutions are admissible as statements against interest under Federal Rule of Evidence 804(b)(3)).

While Rule 402(f) might have prohibited the evidentiary use of Dugan's Nicarico statements in a prosecution against him, the information the statements conveyed is not similarly immunized. Dugan could always be prosecuted on the basis of that information, regardless of whether the statements, themselves, were admissible as evidence against him. Moreover, Dugan provided an abundance of information from which independent evidence usable against him might potentially

be developed (secretor type, fibers from blindfold towel said to be traceable to mother's boyfriend's car, etc.). Thus, Dugan's statements themselves could not be used against him, but they offered a means for police to acquire evidence which could be. The offer of a plea can always be withdrawn by a defendant and nothing prevents the prosecution from refusing the offer of a plea and independently proceeding against a defendant. *Cf. People v. Mack* (1984), 105 Ill. 2d 103, 116 (a prosecutor has the responsibility of evaluating all of the pertinent factors in making his decision whether or not to seek the death penalty and, in doing so, he may properly consider the attitude of the victim's family as one of those factors, thereby rejecting a defendant's proposal to plead guilty in exchange for a life sentence).

Moreover, it is the qualitative content and circumstances of Dugan's statements, rather than their evidentiary value, which determine whether they were against his penal interest. An understanding of the chronology of Dugan's plea bargaining is helpful. The record shows that Dugan's November 13 statement indicating that he killed Jeanine Nicarico was made through his attorney to Du Page County prosecutors in pursuit of a plea agreement for her murder. At the time, Dugan was not at the focus of the Nicarico murder. Dugan made this statement in an attempt to negotiate a plea agreement for the instant murder and, as such, fully implicated himself, regardless of whether his statements could have been used as evidence against him. In fact, by making the statement in the context of plea discussions, Dugan was seeking to persuade Du Page County prosecutors to agree to subsequently accept a consistent confession in support of a guilty plea. Quite obviously then, by making such statement, Dugan was exposing himself to the prospect of criminal prosecution; indeed, that was the whole point in making the

statement. Such statement was thus clearly against his penal interest.

Secondly, the record demonstrates that Dugan made this first Nicarico statement, not in furtherance of the proposed plea agreement for life sentences with respect to the Ackerman and Schnorr murders, but to negotiate a plea agreement for this crime.

While Dugan's second Nicarico statement on November 16 might have been made to help negotiate life sentences for both the Ackerman and the Schnorr murders, such statement, nonetheless, continued to expose Dugan to potential prosecution and imposition of the death penalty for the Nicarico murder. When DCI authorities indicated they were prepared to question Dugan about a McHenry County murder, Dugan specifically indicated that the information he possessed pertained to Nicarico. If Dugan had been seeking merely to gain negotiating leverage by displaying knowledge about multiple unsolved murders, he need not have continued to implicate himself in this particular crime. Furthermore, the Ackerman-Schnorr plea agreement simply required that Dugan truthfully answer police questions about the Nicarico murder; it did not require that Dugan implicate himself or offer unrequested details about the crime.

Dugan's Nicarico statements made after his convictions and sentencings for the Ackerman and Schnorr murders represented a resumed attempt to negotiate a plea agreement with respect to the Nicarico murder. Because he had already been convicted and sentenced for those crimes, there was no continuing obligation on Dugan's part to continue answering police questions about Nicarico. At this point, even though Dugan had received two life sentences, he still faced, according to his counsel, "some exposure" because he could still be prosecuted and sentenced to death for the Nicarico murder. These later Nicarico statements of Dugan's were made to negotiate the elimination of that possibility.

The information Dugan provided police could and still potentially can result in his prosecution for the Nicarico murder for which he can still receive the death penalty. In this case, it should matter little that the State chose not to pursue Dugan and seek the death penalty, as this potentially was and still is a possibility. It matters little for our purposes here, as well as for Dugan's purposes at the time, that Du Page County officials appeared uninterested; at any time, they could have changed their posture and chosen to prosecute him, even seeking the death penalty.

Indeed, the State so much as admits this fact. The argument the State employs on appeal to support a denial of immunity is that it may choose to prosecute Dugan in the future. Accordingly, we find that Dugan's Nicarico statements were clearly against penal interest and met the threshold requirement for admissibility as an exception to the hearsay rule.

## C.
### Evidence Concerning Dugan's Other Crimes

According to defendant, evidence concerning Dugan's five admitted crimes and the circumstances of his confessions to those crimes was admissible under several theories: (1) the evidence was relevant to show Dugan's *modus operandi*; (2) it corroborated the truth and accuracy of Dugan's Nicarico statements; (3) it rebutted the State's proposition that defendant committed this murder with Dugan; and (4) it demonstrated that he possessed the requisite motive (pedophilia) to have assaulted the child victim here. Although at trial defendant argued only that evidence of Dugan's other crimes was admissible on the basis of *modus operandi*, on appeal the parties fully briefed these several theories supporting the admission of the evidence. Under such circumstances, we may consider the admissibility of the

evidence based on these theories as well. See *People ex rel. Daley v. Datacom Systems Corp.* (1991), 146 Ill. 2d 1, 27 (exception to the general waiver rule exists if question is one of law and is fully briefed and argued by the parties).

The basic rule is that all relevant evidence is admissible unless otherwise provided by law. (See *People ex rel. Noren v. Dempsey* (1957), 10 Ill. 2d 288.) In addition to specific laws that may require exclusion, a court may generally exclude relevant evidence if its probative value is outweighed by such dangers as unfair prejudice, jury confusion, or delay. As an outgrowth of this principle, a general rule has developed that evidence of offenses other than those for which a defendant is being tried is inadmissible. (*People v. McDonald* (1975), 62 Ill. 2d 448, 455.) "The underlying rationale is that such evidence 'is objectionable "not because it has no appreciable probative value, but because it has too much." ' " (*People v. Romero* (1977), 66 Ill. 2d 325, 330, quoting *People v. Lehman* (1955), 5 Ill. 2d 337, 342; see also *People v. Hendricks* (1990), 137 Ill. 2d 31, 52.) "The law distrusts the inference that because a man has committed other crimes he is more likely to have committed the current crime. And so, as a matter of policy, where the testimony has no value beyond that inference, it is excluded." *People v. Lehman* (1955), 5 Ill. 2d 337, 342.

This court has repeatedly held that evidence of other crimes is admissible "if it is relevant *for any purpose other than* to show the propensity to commit crimes." (Emphasis added.) *People v. Phillips* (1989), 127 Ill. 2d 499, 520; see *People v. Evans* (1988), 125 Ill. 2d 50; see also E. Cleary, McCormick on Evidence § 190, at 448 (2d ed. 1972) (range of permissible uses of other-crimes evidence is "almost infinite").

Where other-crimes evidence is offered, it is admissi-

ble only where the other crime bears some threshold similarity to the crime charged. (See *Illgen*, 145 Ill. 2d at 372, quoting *People v. Bartall* (1983), 98 Ill. 2d 294, 310.) This threshold requirement serves to increase the relevancy of the evidence and ensures that the evidence is not being used solely to establish a defendant's criminal propensities. (See *People v. Bartall* (1983), 98 Ill. 2d 294, 310.) In cases where evidence of other crimes is offered, however, to establish *modus operandi* or a common design or plan, a "high degree of identity" between the facts of the crime charged and the other offense has been required. (*Illgen*, 145 Ill. 2d at 373; see also *People v. Tate* (1981), 87 Ill. 2d 134, 141 (other-crimes evidence "is found to be relevant and admissible as proof of *modus operandi* only upon a strong and persuasive showing of similarity").) This high degree of identity between the other offense and the charged crime is necessary because *modus operandi* refers to a pattern of criminal behavior so distinctive that separate crimes are recognized as the handiwork of the same wrongdoer. (See M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 404.5 (5th ed. 1990).) This court has also recognized that even where such evidence is offered to prove *modus operandi* "some dissimilarity will always exist between independent crimes." *People v. Taylor* (1984), 101 Ill. 2d 508, 521; see also *People v. Phillips* (1989), 127 Ill. 2d 499, 520-521 ("test is not one of exact, rigorous identity").

That same degree of identity between the two offenses is not necessary when evidence of the other crime is offered for some purpose other than *modus operandi*. (*Illgen*, 145 Ill. 2d at 373; *People v. McKibbons* (1983), 96 Ill. 2d 176, 185-86.) Thus, where a defendant's involvement in another offense was offered to prove the absence of an innocent frame of mind or the presence of criminal intent, mere general areas of similarity have

sufficed. *Illgen,* 145 Ill. 2d at 373; *McKibbons,* 96 Ill. 2d at 185-86; see also *People v. King* (1986), 109 Ill. 2d 514 (evidence of defendant's other crime relevant and admitted to establish accuracy of confession without analysis concerning degree of identity between two crimes); *People v. Baptist* (1979), 76 Ill. 2d 19, 27 (no analysis concerning degree of identity between two crimes when evidence offered to show consciousness of guilt).

In this case, defendant sought to introduce exculpatory evidence concerning a nontestifying third party's crimes and the circumstances of his confessions to those crimes. We agree with defendant that in cases where a defendant seeks to introduce other-crimes evidence to exculpate himself, there is usually no need for the trial court to be concerned with balancing probative value against prejudicial effect. (See 1 S. Gard, Illinois Evidence Manual 48 (Supp. 1990) ("reasons for exclusionary rule when applied to the defendant in a criminal action do not exist in the case of other persons").) Thus, as this court recognized in *Tate,* the most recent case dealing with other-crimes evidence offered by a defendant, such evidence is admitted where the evidence contains "significant probative value" to the defense without any reference to the element of prejudice. *Tate,* 87 Ill. 2d at 143. See also M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 405.5, at 196 (5th ed. 1990).

Other courts have also recognized that there is a distinction between the limits imposed on a defendant's use of other-crimes evidence to exculpate himself and the State's use of such evidence to prosecute him. See *United States v. Cohen* (11th Cir. 1989), 888 F.2d 770, 777; *United States v. Aboumoussallem* (2d Cir. 1984), 726 F.2d 906, 911; *United States v. Stamper* (W.D.N.C. 1991), 766 F. Supp. 1396, 1406; *State v. Garfole* (1978), 76 N.J. 445, 452-53, 388 A.2d 587, 591.

Defendant contends that the evidence concerning Dugan's other crimes was admissible under a *modus operandi* theory to show that he "spoke truthfully when he admitted to having killed Jeanine Nicarico in the manner that he did." We disagree with defendant's assertion that *Tate* allows for a relaxed degree of identity between the crimes compared when other-crimes evidence is offered by a defendant. While *Tate* dispenses with the consideration of prejudice when such evidence is offered by a defendant, *Tate* requires that "for such evidence to have significant probative value" under *modus operandi*, there must be a substantial and meaningful link between the offenses being compared, regardless of which party offers the evidence. *Tate*, 87 Ill. 2d at 143.

In the present case, evidence of Melissa Ackerman's murder only was admissible under a theory of *modus operandi*. In both of Dugan's accounts of the Ackerman and Nicarico murders, he was aimlessly driving around alone in his auto, smoking marijuana, before he encountered the female, Caucasian child-victim. In neither instance was the crime apparently premeditated or planned. In both accounts, Dugan recklessly abducted the victim during daylight hours, in full view, by perhaps placing the victim in the front, passenger-side area of his auto. In both accounts, Dugan attempted to hide or cover the victim with some type of bedding (sleeping bag or sheet). Both accounts also involved anal sex and the tying of the victim's hands. We find that a "substantial and meaningful" linkage was established between the compared offenses such that Dugan's confession to the Ackerman murder was probative of the truth of his account of the Nicarico murder.

The facts and Dugan's account of his remaining other crimes were also similar in significant respect to his account of the Nicarico murder. While there was not

a sufficient linkage among these crimes to support admission of them all under a theory of *modus operandi*, there was a sufficient degree of similarity to support their entire admission for purposes other than to show *modus operandi*. In each murder, Dugan tied the victim's hands at some point. In all of the murders, Dugan availed himself of whatever physical material (water, tire iron, tree branch) was immediately at hand for use as a murder weapon. Several of the crimes, like the Nicarico murder, involved sexual assaults in an auto, blindfolding, tire irons, blows to the head, and the use of bedding materials. Two of the three murders involved blunt trauma, and two of the three involved drowning. Every crime involved the use of an auto to abduct the victim, and every crime involved the abduction of a young, Caucasian female. Although each crime does not bear the same similar feature, various similar features are repeated. The greatest similarity between these crimes, however, lies not in discrete and observable facts, but in the character of the assaults as a whole. (*Tate*, 87 Ill. 2d at 143.) The crimes appear unpremeditated, highly spontaneous, and reckless in their regard to possible apprehension.

The requisite degree of similarity having been established, this evidence of Dugan's other crimes was admissible to corroborate his statements about the Nicarico murder. In *People v. King* (1986), 109 Ill. 2d 514, this court found that "[t]he evidence of the other crime tended to corroborate the defendant's statements in his confession concerning the two offenses." (*King*, 109 Ill. 2d at 531.) *King* held that "[e]vidence regarding the *** robbery was relevant to establish the accuracy of the confession" to the charged crime. *King*, 109 Ill. 2d at 531. See also *People v. Kokoraleis* (1989), 132 Ill. 2d 235, 258 (evidence of defendant's other crimes "tended to support the reliability and accuracy of the defendant's confession" to the charged murder).

The State, however, cites to *People v. Romero* (1977), 66 Ill. 2d 325, and *People v. Thingvold* (1991), 145 Ill. 2d 441, 452, for the proposition that other-crimes evidence may not be introduced to bolster a witness' credibility. The correct statement of the law in *Thingvold* is that evidence of other crimes is not admissible to bolster the credibility of a *prosecution* witness. (*Thingvold,* 145 Ill. 2d at 459, citing *Romero*, 66 Ill. 2d 325.) The *Thingvold* court did not reach any consideration of this rule under the facts of the case, finding, as a threshold matter, that the evidence was not admissible as traditional other-crimes evidence because there was nothing connecting the defendant to the other crime. In *Romero*, the court rejected the State's proffered reason for using the other-crimes evidence, to enhance the credibility of its witness, as not being supported by authority. Although *Romero* does not expressly state as much, the State had failed to demonstrate that the other-crimes evidence was used for anything other than showing *the defendant's* propensity to commit crime. Unlike the case at bar, *Romero* was concerned with possible prejudice to the defendant. In this case, if the other-crimes evidence contained significant probative value to the defense, it was admissible.

In the instant case, the State attacked the reliability and accuracy of Dugan's Nicarico statements. In rebuttal, defendant attempted to corroborate the accuracy of Dugan's Nicarico statements by showing that they were given within the context of his apparently accurate and acceptable formal confessions to five other similar crimes. As in *King* and *Kokoraleis*, we believe this other-crimes evidence was probative of the accuracy of certain key evidentiary statements. The fact that Dugan formally confessed to the kidnappings, rapes and murder of a female child and young women contemporaneous with his statements that he committed similar acts against the Nicarico child speaks to the accuracy of

his statements. Evidence is considered "relevant" if it has any tendency to make the existence of any fact that is of consequence to the determination of an action more or less probable than it would be without the evidence. (*People v. Stewart* (1984), 105 Ill. 2d 22, 54.) We conclude that evidence of Dugan's other crimes and the circumstances of his confessions to those crimes was probative of whether Dugan's Nicarico statements were accurate and reliable. The other-crimes evidence, in its entirety, was therefore relevant and admissible on this basis.

As part of a dual strategy to combat Dugan's Nicarico statements, the State also attempted to undercut the statements in another way. Accepting that Dugan's Nicarico statements might be accurate regarding the general details of the crime itself, the State presented evidence to show defendant and Dugan's joint participation. Thus, the State presented evidence or argued that different shoeprints were found outside the Nicarico home, that bloodhounds followed different trails during the police investigation, and that Dugan accompanied defendant at Rodriguez's home around the time of the murder. In rebuttal, defendant attempted to demonstrate the implausibility of this theory by introducing Dugan's other crimes, revealing that Dugan invariably acted alone in committing similar crimes.

The State argues that this claimed basis for admitting the evidence is only a form of *modus operandi*. We disagree under the circumstances presented here. (But see *Kokoraleis*, 132 Ill. 2d at 257 (fact of defendant's presence during other crimes admissible under *modus operandi* to prove his participation in charged crime).) Defendant sought to introduce all of the facts of Dugan's other crimes to show that Dugan was truthful in his statements that he killed the victim. Defendant sought to introduce the fact that Dugan acted alone in every one of these admitted crimes to show that Dugan

did not act with defendant as postulated by the State. The probative value of this evidence depends not on any heightened degree of identity between the crimes compared, as is the case in *modus operandi*, but on the consistency of Dugan's solitary conduct in similar situations.

We find that evidence that Dugan always acted alone in all his other similar crimes was probative of whether Dugan committed this crime with defendant.

Under the circumstances of this case, we believe that the evidence of Dugan's other crimes and the circumstances of his confessions to those crimes was relevant and admissible. The Dugan-Cruz linkage was an essential element of the State's case. Defendant was thus entitled to rebut the evidence of that linkage with nonprejudicial and relevant evidence. The exclusion of the Dugan other-crimes evidence was, accordingly, an abuse of discretion.

## II.
### Impeachment of Erma Rodriguez

At trial, Erma Rodriguez, defendant's cousin, was called to testify as a witness for the State. The State impeached her testimony by examining her regarding certain prior inconsistent statements. The State also presented Ramon Mares, defendant's uncle, and Detective Warren Wilkosz, who related Rodriguez's prior inconsistent statements. Defendant argues on appeal that admission of this impeachment evidence was in error, the State compounded the error by making substantive use of the evidence in closing argument, and the compounded error was not harmless or cured by jury instruction.

In its opening statement at trial, the State asserted that Erma Rodriguez saw defendant and another person in a car near her home on Easter 1983, and that several

weeks before that date, defendant came to her home early one morning, crying, agitated and emotional and asked her to mail a letter to his mother. The State asserts on appeal that it expected Rodriguez to testify, confirming the mail-request incident, and that defendant had said he was in trouble at the time, and also to testify that Dugan was the person with defendant on the particular Easter Sunday. The record reflects and the State does not deny, however, that Rodriguez told prosecutors prior to trial that she had never witnessed defendant and Dugan together.

When called, Rodriguez testified that she saw defendant on the two occasions: Easter Sunday 1983, when defendant was at her home in a parked car with an unknown male individual and argued with her father, and *about one week before* that incident when defendant came to her home early one morning, asking her to mail a letter to his mother. Rodriguez did not recall telling Wilkosz that the mail-request incident occurred *several weeks before Easter*. She also testified that defendant said nothing at the time besides requesting that she mail a letter to his mother. The prosecutor then impeached Rodriguez by introducing, in the form of a series of questions, her allegedly prior inconsistent statements made to Wilkosz and Mares. Rodriguez denied telling Wilkosz that, during defendant's early morning visit to her home, defendant was crying and very upset or said he was in trouble, or that Dugan was with defendant on Easter Sunday. Rodriguez similarly denied telling Mares that Dugan was the man in the car with defendant on Easter, or that Dugan and defendant were friends and "hung around together."

Rodriguez's additional affirmative testimony, brought out under defense questioning, was essentially that Dugan had moved within a few houses of where she resided sometime around the beginning of July 1984,

she had seen Dugan a few times in his yard, she did not talk to Dugan, she never saw defendant and Dugan together, she told Wilkosz and the prosecutors that she knew Dugan, and she previously told prosecutors that she had never seen defendant and Dugan together and she had seen defendant with a male Caucasian on Easter Sunday.

The State continued to impeach Rodriguez through the testimony of Mares and Wilkosz. Under direct examination, Mares testified that Rodriguez had previously related to him that Dugan was the passenger in defendant's car on Easter 1983, and that Dugan and defendant used to "hang around" the neighborhood together at a younger age. Wilkosz testified also that Rodriguez told him that Dugan was in the car with defendant on Easter, and that "several weeks" before Easter defendant visited her, crying and upset, and saying he was "in trouble."

During closing argument, the prosecutor stated several times, consistent with the impeachment testimony, that the mail-request incident occurred in late February 1983 (which was around the time of the crime). For example:

"When you weigh Erma Rodriguez' testimony, and the testimony that she told you in the courtroom and whether she told you the whole truth about what happened in late February, Saturday morning, 3:00 a.m., consider the testimony of Warren Wilkosz, Detective Wilkosz. The testimony that he told you in court, in which he said that when he interviewed Erma Rodriguez she told him—
* * *
When you consider whether Erma Rodriguez told you the truth, consider what Detective Wilkosz said. Erma Rodriguez told Detective Wilkosz that Ronnie Cruz, her cousin, came to her home on Saturday morning in late February at 3:00 a.m. He was crying, he was upset, and he told her, I am in trouble. Mail a letter to my mother."

The State's rebuttal included the following:

"[Prosecutor]: Remember what Erma Rodriguez said about the incident at 2:00 or 3:00 o'clock Saturday morning, sometime before Easter, 1983, which puts it right in the time frame of February 25, 1983. That Cruz came in, and again this streetwise, tough kid was crying and aggitated [*sic*], and said according to—
\* \* \*

[Defense Counsel]: That's offered as substantive evidence, it is improper. Move to strike.

[The Court]: Only use the evidence which was received.

[Prosecutor]: I am, Judge. Who was impeaching her inability to remember what was said, when Warren Wilkosz said that Cruz was crying and he said he was in trouble and wanted her to mail a letter, an act which anybody can do by walking to a box and dropping it in.

I submit that's very strange conduct at 2:00 a.m., approximately the time of the Nicarico homicide.
\* \* \*

Now she testified that she couldn't see the passenger in that car. But please recall that Warren Wilkosz had talked to her just weeks before, and that she told Warren Wilkosz—

[Defense Counsel]: Objection.

[The Court]: Same ruling.

[Prosecutor]: This is impeachment. She told Warren Wilkosz that the white boy in the car with Rolando Cruz on Easter, 1983, was Brian Dugan."

Our Rule 238 (134 Ill. 2d R. 238) governs impeachment of witnesses and examination of hostile witnesses in criminal cases. (See 134 Ill. 2d R. 433.) Under Rule 238(a), the credibility of a witness can be attacked by any party, including the party calling the witness. Such an attack may be accomplished by impeaching the witness with evidence of a prior inconsistent statement. (See *People v. Morgan* (1963), 28 Ill. 2d 55, 63.) The admission of this evidence is premised on the fact that excluding it would deprive the examining party of the opportunity to exhibit the truth and leave him prey to a hostile witness. A counter concern, however, is that such extrajudicial statements are "often highly incriminat-

ing and are usually made outside the presence of the defendant." (*People v. Collins* (1971), 49 Ill. 2d 179, 194.) What a witness states out of court and out of the presence of the defendant is pure hearsay and incompetent as substantive evidence. (See *Bailey*, 60 Ill. 2d at 43, citing *People v. McKee* (1968), 39 Ill. 2d 265, 270; *Bradford*, 106 Ill. 2d at 499; but see Ill. Rev. Stat. 1991, ch. 38, par. 115—10.1 (permitting substantive admissibility in criminal cases as to certain kinds of prior inconsistent statements).) Consequently, it must be borne in mind that the purpose of such impeachment evidence is to destroy the credibility of the witness and *not* to establish the truth of the impeaching material. (See *Bradford*, 106 Ill. 2d at 499; *Bailey*, 60 Ill. 2d at 43.) Prior inconsistent statements, with the exception of those admissible under section 115—10.1 of the Code of Criminal Procedure of 1963, are not to be treated as having any substantive or independent testimonial value.

Recognizing the danger that prior inconsistent statements could be improperly introduced under the guise of impeachment, this court stated in *People v. Weaver* (1982), 92 Ill. 2d 545, 563:

> "A court's witness, or any witness for that matter, cannot be impeached by prior inconsistent statements *unless his testimony has damaged, rather than failed to support the position of the impeaching party.* The reason for this is simple: No possible reason exists to impeach a witness who has not contradicted any of the impeaching party's evidence, except to bring inadmissible hearsay to the attention of the jury.

> Impeachment is supposed to cancel out the witness' testimony. It is only when the witness' testimony is more damaging than his complete failure to testify would have been that impeachment is useful." (Emphasis added.)

(Accord *People v. King* (1986), 109 Ill. 2d 514, 528.) *Weaver* found error in the impeachment of a witness because his testimony had not damaged the State's case, and the State's improper motivation to substantively

use the impeaching evidence was apparent on the face of the record. The State's improper motivation was revealed by the fact that the impeachment negated evidence which, although disappointing, was favorable to the State and resulted in the State's being left with no evidence other than the improperly used impeachment evidence to support one of its key propositions. The error was then compounded by the State's treatment of the impeachment evidence as though it were substantive evidence in the closing argument.

"Damage" as referred to in *Weaver* does not occur where a party interrogates a witness about a fact which would be favorable to the examiner if true, but then receives a reply which is merely negative in its effect on the examiner's case. (See *People v. Chitwood* (1976), 36 Ill. App. 3d 1017, 1024; 1 J. Strong, McCormick on Evidence § 37 (4th ed. 1992).) Such testimony is merely disappointing and not damaging since the examiner's case is no worse off than if the witness had not testified. "Affirmative damage results only from testimony that gives positive aid to an adversary's case." Graham, *Prior Inconsistent Statements—Impeachment and Substantive Admissibility: An Analysis of the Effect of Adopting the Proposed Illinois Rules of Evidence*, 1978 U. Ill. L.F. 329, 372; see M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 607.4, at 349 (5th ed. 1990).

The State contends, however, that *Weaver* is factually distinguishable, in significant respect, from the present case. According to the State, in this case, unlike *Weaver*, there exists evidence (Robert Turner's testimony) besides the impeachment evidence to support the State's proposition of a Cruz-Dugan personal relationship. Thus, "[t]he problem of *Weaver*, the substantive use of impeachment because there has been no other way to prove a proposition, did not exist here on the part of the People." We fail to grasp the significance of the dissimilarity relied on by the State.

In *Weaver*, this court referred to the absence of substantive evidence in support of the State's proposition, resulting from the State's impeachment of favorable testimony. These circumstances revealed that the impeachment was improperly motivated. In the present case, we cannot conclude to the converse, *i.e.*, that the impeachment was properly motivated, merely because the State had other available means to prove the Cruz-Dugan personal relationship. The fact that the State had other evidence to prove this proposition is significant only to the extent that no basis was thereby offered to infer improper motive on the part of the State. Improper motive can be and was, however, shown by other circumstances. The test for determining whether impeachment is permissible depends on objectively identifiable facts from which the examiner's state of mind can be inferred. That the *Weaver* court could discern improper motive from the illogic of the impeachment there as well as from the absence of damage to the impeaching party's case does not mean that *Weaver* is not controlling here. And finally, that the State could rely on Robert Turner's testimony in its attempt to establish the Cruz-Dugan relationship in no sense shows that its impeachment of Rodriguez was properly motivated and permissible.

*Weaver* does, however, concern impeachment of a witness under the form of Rule 238 existing when these crimes were committed. Nonetheless, subsequent amendment of the rule did not change the principle that a witness' prior inconsistent statement could only be introduced to impeach the witness. (See Ill. Ann. Stat., ch. 110A, par. 238, Historical & Practice Notes, at 522 (Smith-Hurd 1985).) Accordingly, the affirmative damage requirement remained viable. See *Bradford*, 106 Ill. 2d at 500 ("[a] court's witness may be impeached by a prior inconsistent statement when the witness' testimony

damages the position of the impeaching party"); M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 607.4, at 353 (5th ed. 1990).

We agree with defendant that the enactment of section 115—10.1 of the Code of Criminal Procedure of 1963, subsequent to these crimes, supports a rigorous enforcement of the damage requirement under Rule 238(a). (See Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1(c)(2).) Now that a party can admit into evidence a "turncoat" witness' prior inconsistent statement by complying with section 115—10.1, the introduction of oral inconsistent statements under the guise of impeachment should be foreclosed. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 607.4, at 354-55 (5th ed. 1990); Steigmann, *Prior Inconsistent Statements as Substantive Evidence in Illinois*, 72 Ill. B.J. 638, 642-43 (1984).

The State, nonetheless, relies on *People v. Steptore* (1972), 51 Ill. 2d 208, to support the view that Rodriguez could be impeached by the use of extrinsic evidence in the form of Mares' and Wilkosz's testimony. *Steptore*, however, concerned an additional foundational requirement that impeachment, by extrinsic evidence, be with regard to noncollateral matters. There is no question in the present case concerning collateralness.

Based on our review of the record, Rodriguez's testimony did not damage the State's case. Rodriguez's affirmative testimony was entirely neutral. Rodriguez's testimony that she had not observed defendant and Dugan together was similarly neutral. This evidence neither contradicted any evidence presented by the State nor provided positive aid to defendant's body of evidence. As a result, while the State may have been disappointed that Rodriguez did not testify in accordance with what was expected of her, the prosecution's case was no worse off than had Rodriguez not taken the

stand at all. Indeed, Rodriguez's testimony that Dugan once resided near her home and that he had given her family a dog was, as in *Weaver*, favorable, albeit disappointing, to the State. In sum, Rodriguez did not testify to anything of an adversely affirmative nature which could have justified the impeachment of her credibility. We perceive no possible reason for the impeachment of Rodriguez except to attempt to bring inadmissible hearsay to the attention of the jury. Impeachment is intended as a means to cancel out damaging testimony. There was simply no damaging testimony here to cancel. Considering the generally neutral quality of Rodriguez's testimony and the obvious value of her prior inconsistent statements as substantive evidence, we cannot but conclude that the motivation for introducing her prior inconsistent statements was improper.

The State claims that Rodriguez's "turnabout" and "retraction" damaged its case in the eyes of the jury because it "belied" the State's opening statement as to the evidence which would be presented. The State cites several authorities (*State v. Ortlepp* (Minn. 1985), 363 N.W.2d 39; *Gordon v. United States* (D.C. 1983), 466 A.2d 1226; *State v. Governor* (La. 1976), 331 So. 2d 443) which supposedly support the view that a discrepancy between testimony and opening statement is important in assessing the propriety of impeachment. Reliance on these authorities for this proposition, however, requires a significant stretch of the imagination. We remain convinced that impeachment is designed to challenge the credibility of a witness and is not a means of rehabilitating counsel's arguments to the jury. Furthermore, even assuming that Rodriguez's impeachment was permissible to rehabilitate the State's opening statement, the State in opening never represented that a Cruz-Dugan relationship would be established. Thus,

even under the State's theory, there would have been no justification for introducing any impeachment evidence pertaining to a critical Cruz-Dugan link. We conclude that the trial court abused its discretion in allowing impeachment of Rodriguez under the circumstances presented here. Rodriguez's testimony did not damage the State's case in the eyes of the jury. Rodriguez's prior inconsistent statements were therefore not admissible for any purpose and admission under these circumstances was impermissible.

It is well recognized that jurors may find it difficult to consider prior inconsistent statements solely to determine credibility and may afford such testimony substantive value. (See *Bailey*, 60 Ill. 2d at 43, citing *People v. Paradise* (1964), 30 Ill. 2d 381, 384.) Consequently, " '[t]his court has repeatedly disapproved prosecutorial efforts to impart substantive character to prior inconsistent statements under the guise of impeachment.' " *Bradford*, 106 Ill. 2d at 499, quoting *People v. Bryant* (1983), 94 Ill. 2d 514, 522.

The State contends that it did not seek to use the impeachment testimony of Mares and Wilkosz as substantive evidence during closing argument. The prosecutor merely "asked" the jury to properly weigh Rodriguez's testimony against the impeachment testimony of Wilkosz to decide Rodriguez's credibility. The logical question which arises from this argument, however, is, Her credibility as to what? Surely, the jury was not expected to decide Rodriguez's credibility as to whether defendant came to her home on Easter 1983 with an unidentifiable person and also a week earlier to ask that a letter be mailed. It may be that the State did indeed wish to attack Rodriguez's credibility, but it was her credibility as to whether she observed Dugan with defendant on Easter Sunday. Such an attack accepts the prior inconsistent statements for the truth of the matter

asserted. The State's contention is, accordingly, meritless.

The record shows that the prosecutor repeatedly referred the jury to the substance of Rodriguez's alleged statements to Wilkosz. The prosecutor also requested the jury to consider whether Rodriguez or Wilkosz was telling the truth. Additionally, the prosecutor repeatedly mischaracterized the impeachment evidence as if it indicated that the mail-request incident occurred around the time of the murder. (See *People v. Linscott* (1991), 142 Ill. 2d 22 (prosecutor's closing remarks held beyond fair comment on the evidence).) If there was any doubt before, this conduct conclusively establishes that Rodriguez's prior inconsistent statements were introduced solely for the purpose of placing inadmissible hearsay before the jury. There is simply no other way to construe five separate references to defendant's mail request as having occurred around the time of the crime and two references to defendant's having been with Dugan. The record clearly demonstrates that the State argued as though Rodriguez's prior inconsistent statements were substantive evidence.

The State yet contends that any error in the admission and use of this evidence was cured by a jury instruction drafted by the defense which adequately ensured that the jury would not give the evidence substantive weight. Following a brief recess during Mares' examination, the trial court instructed the jury:

"Any evidence that was received for a limited purpose should not be considered by you for any other purpose, and the believability of a witness may be challenged by evidence that on some former occasion he or she made a statement that was not consistent with his testimony in this case. Evidence of this kind may be considered by you only for the purpose of deciding the weight to be given the testimony you heard from the witness in this courtroom."

At a later point during Mares' testimony, the trial court

admonished the jury to recall the instruction. The court additionally stated, "You are again told what a limited purpose situation is." The instruction was repeated during Wilkosz's examination and at the close of the evidence.

To reduce the risk that a jury might consider a prior inconsistent statement as independent evidence with substantive character, the jury should be cautioned and properly instructed to limit its consideration of the statement to its narrow purpose. (*Bradford*, 106 Ill. 2d at 501 (citing cases).) Even with instruction, however, such errors have been considered grounds for reversal. (See *Bailey*, 60 Ill. 2d at 44 (finding error, despite jury instruction, where prosecution attempted to improperly impart substantive character to impeached witness' prior inconsistent statements).) And where Illinois courts have ruled that improper impeachment as well as improper substantive use of that evidence occurred, our courts have reversed without even considering the possible curative effect of jury instructions. See *Weaver*, 92 Ill. 2d 545; see also *People v. Johnson* (1985), 138 Ill. App. 3d 980; accord *People v. Kimbrough* (1970), 131 Ill. App. 2d 36.

The present case concerns both improper impeachment and an attempt to substantively use the impeachment evidence during closing argument. Under such circumstances, limiting instructions were inadequate to ensure that the jury considered the evidence for any proper purpose because there was none. The instructions here could not cure this fundamental error.

### III.
### Evidence of Bloodhound Trailing

Defendant contends that the trial court erred in admitting evidence concerning the actions of several bloodhounds during the police investigation which

followed Jeanine's disappearance. Specifically, defendant contends that this evidence was either inadmissible *per se* or inadmissible in this case and was also prejudicially distorted by the State in closing argument.

Lieutenant Towns-end, the police dog trainer, testified regarding his extensive background as well as the background, training and typical trailing behavior of two of his bloodhounds. According to Towns-end, his two dogs possessed a success rate of "85 percent" based on the number of their "finds." Towns-end allowed that his dogs were "man-trailers," who follow the "affluency of a scent" as opposed to "man-trackers," dogs which go from footprint to footprint locating the actual path taken by an individual.

Towns-end testified essentially that his dogs "scented" Jeanine's bedclothes and then went from the front stoop of her home to a location on the Nicarico's front lawn near the curb and sat down. Towns-end also testified that one of his dogs then "scented" from the tire impression in the front lawn, observed near where the dogs sat down and went back to the front stoop by a slightly different path. Towns-end further related that he also allowed the same dog to "scent" from the footprint on the Nicarico's front door, and the dog took the same path as that taken from the front stoop. Towns-end also testified that none of the dogs indicated that a scent ended in the driveway area.

Under cross-examination, Towns-end allowed that weather conditions such as wind, snow, and dryness can affect a dog's ability to trail. Significantly, Towns-end could not say that the first path taken by the dogs was the path taken by Jeanine when she was abducted or was the exact path that an individual had walked. Neither was Towns-end prepared to say that the trail had anything to do with the date of her disappearance or her abduction. Towns-end, furthermore, acknowledged

that he was not attempting to convey that there was any relationship between the end of the dogs' first path and the depression in the lawn. Towns-end could only say that his dog sniffed the depression and then took a slightly different path back to the Nicaricos' front door. Towns-end could offer no evidence about when the depression was made.

The State relied on this bloodhound evidence to both attack the veracity of Dugan's Nicarico statements and to also support the proposition that Dugan did not act alone as indicated by those statements. The prosecutor argued in closing:

> "When you hear the different stories that have been related through Dugan's lawyers to you, and you examine the evidence that you know in this case, *you know that Brian Dugan cannot be the sole killer of Jeanine Nicarico. The evidence proves Dugan is wrong on that point, we know that there is more than one person involved, we know that there is more than one burglar and we know there is more than one killer.* We have four different shoe prints found at the scene of the house. *We have the bloodhounds following different trails around the house.* You heard the testimony." (Emphasis added.)

In this vein, the prosecutor made repeated references that the bloodhound evidence showed that Dugan was lying about putting Jeanine in his parked car in the Nicarico driveway, and that more than one path was taken by the culprits to and from the home.

Years ago, this court concluded that "testimony as to the trailing of either a man or an animal by a bloodhound should never be admitted in evidence in any case." (*People v. Pfanschmidt* (1914), 262 Ill. 411, 461; but see *People v. Callahan* (1926), 324 Ill. 101, 111.) The court explained:

> "Neither court nor jury can have any means of knowing why the dog does this thing or another, in following in one direction instead of another; that must be left to his instinct without knowing upon what it is based. The infor-

mation obtainable on this subject, scientific, legal or otherwise, is not of such a character as to furnish any satisfactory basis or reason for the admission of this class of evidence. \*\*\* [T]he 'conclusions of the blood-hound are generally too unreliable to be accepted as evidence in either civil or criminal cases.' " *Pfanschmidt*, 262 Ill. at 462, quoting *Brott v. State* (1903), 70 Neb. 395, 398, 97 N.W. 593, 594.

The State points out that *Pfanschmidt* concerned dog trailing of an animal, not a human. The State maintains that *Pfanschmidt* is, therefore, limited to the holding that evidence concerning bloodhound trailing of an animal is inadmissible. According to the State, *Pfanschmidt*'s statements concerning bloodhound evidence in general constitute merely *dicta*.

*Pfanschmidt* discussed at length the individualized approach taken by many jurisdictions to admit this sort of evidence as it pertains to humans and explicitly rejected it in favor of a *per se* rule with respect to humans and animals. It is thus clear that the parties argued for the adoption of an individualized approach and the court's pronouncements on the subject constitute judicial *dicta* having precedential effect. (See *Cates v. Cates* (1993), 156 Ill. 2d 76, 80.) Further, in *People v. Wolf* (1929), 334 Ill. 218, 229, this court was presented with the opportunity to review the admission of testimony referring to bloodhounds. The *Wolf* court flatly reiterated that "[t]he law is \*\*\* as laid down in [*Pfanschmidt*], that testimony of the trailing of either man or animal by a bloodhound should never be admitted in evidence in any case." Thus, even assuming that the statements in *Pfanschmidt* constitute *dicta*, *Wolf* constitutes binding authority for the rule that evidence concerning bloodhound trailing is inadmissible *per se* in Illinois. *Cates*, 156 Ill. 2d at 80; see also *People v. Griffin* (1964), 48 Ill. App. 2d 148.

We continue to adhere to the principle that blood-

hound evidence is inadmissible to establish any factual proposition in a criminal proceeding in Illinois. Having reviewed those cases admitting such evidence, we remain unpersuaded that this class of evidence is reliable. Moreover, we recognize that the real danger posed by admitting bloodhound evidence lies not simply in its fallibility, but in its potential to prejudice. " 'It is well known that the exercise of a mysterious power not possessed by human beings begets in the minds of many people a superstitious awe ***. The very name by which the animal is called has a direct tendency to enhance the impressiveness of the performance ***.' " (*Pfanschmidt*, 262 Ill. at 458, quoting *Pedigo v. Commonwealth* (1898), 103 Ky. 41, 50, 44 S.W. 143, 145; see also 1A J. Wigmore, Evidence § 177, at 1852 (Tillers rev. 1983); see also Taslitz, *Does the Cold Nose Know? The Unscientific Myth of the Dog Scent Lineup*, 42 Hastings L.J. 15, 19 (1990).) We believe that such evidence is generally lacking in probative value when balanced against the dangers of unfair prejudice. *Cf. People v. Zayas* (1989), 131 Ill. 2d 284 (hypnotically refreshed testimony held inadmissible *per se* except when defendant is witness); *People v. Baynes* (1981), 88 Ill. 2d 225 (polygraph evidence held inadmissible *per se*).

The State correctly asserts that a majority of foreign jurisdictions admit evidence based on dog scenting or tracking on an individualized basis upon a proper foundational showing (*e.g.*, particular breeding and proven reliability of dog; circumstances surrounding the trailing or scenting). (See Annot., 18 A.L.R.3d 1221, 1230 (1968); *Terrell v. State* (1968), 3 Md. App. 340, 239 A.2d 128 (for history of dog-tracking cases).) The State attempts to distinguish *Pfanschmidt* from the facts before us and urges comparison of this case to that particular body of decisional law. In the State's view, *Pfanschmidt*'s holding is primarily based on the prosecution's

failure to satisfy these evidentiary foundational requirements, which were met in the instant case.

We agree with the State that the circumstances in *Pfanschmidt* presented the court with a worst case scenario in terms of satisfying these foundational requirements. However, even were we inclined to relax *Pfanschmidt*'s *per se* rule of inadmissibility in favor of the individualized approach taken in other jurisdictions, most of the bloodhound evidence here would not pass muster.

The overwhelming number of foreign cases which admit bloodhound evidence concern its use for purposes of identifying the guilty party. Generally speaking, the proper foundational requirements, according to these authorities, refer both to the qualifications of the dog and to the circumstances surrounding the trailing. (18 A.L.R.3d at 1239.) With respect to the circumstances of the trailing, it must be shown that the dog was put on the trail at some place and time where the evidence shows that the guilty party had been and had made the trail. This requirement assures that the dog's subsequent identification of a person as the guilty party has some corroborated basis. This requirement as to the circumstances of the dog trailing thus serves to insure that the evidence is relevant. Without such other evidence it could not be said that the resulting "identification" of a person had any connection to the crime whatsoever and the dog-trailing evidence would be entirely irrelevant on the issue of identity. (See *State v. Rowland* (1965), 263 N.C. 353, 139 S.E.2d 661 (discussing that defendant's possession of money established relevancy of certain dog-tracking evidence).) In other words, a dog might be a pure-bred, experienced, reliable "man-trailer" handled by a professional, thereby meeting certain of the foundational requirements, but if the circumstances of the dog's trailing failed to show that what it did was

connected to the case, the evidence would be irrelevant and therefore inadmissible. In this manner, the individualized approach, by relying on foundational requirements, assures exclusion of irrelevant evidence.

Significantly, also, in the vast majority of the foreign cases relied on by the State, the dog either actually trailed and found a defendant who was independently shown to be involved in the crime (*Terrell v. State* (1968), 3 Md. App. 340, 239 A.2d 128; *People v. Craig* (1978), 86 Cal. App. 3d 905, 150 Cal. Rptr. 676), or demonstrated a "scent" linkage between items independently known to belong to both defendant and victim and connected with the crime itself (see *State v. Roscoe* (1984), 145 Ariz. 212, 700 P.2d 1312; *cf. United States v. McNiece* (1983), 558 F. Supp. 612 (linkage between defendant and tools at crime scene)). In such cases, it is only because the dog actually finds the defendant or some item that is clearly relevant to the case that it becomes possible to conclude that the dog was not on a random trail.

In the present case, with the exception of the last path run by the dog after it scented from the shoeprint on the front door, the circumstances of the bloodhound trailing here failed to show any connection with Jeanine's abduction. Neither the path taken by the dogs after scenting Jeanine's sheets nor the path taken after scenting the tire impression in the front lawn was shown to be connected to the kidnapping. Towns-end admitted as much. Towns-end, himself, was unable to say that the various paths taken by his dogs had anything to do with Jeanine's abduction. Furthermore, Towns-end was even unable to say that the paths traveled by his dogs on either side of the tree were paths walked by the person supposedly leaving the scent trail. The evidence was thus incompetent to show the path by which Jeanine was taken from her home or that there was more than one path taken by any abductors. Thus, aside from any

*per se* rule against admission of this evidence, most of the bloodhound evidence here was lacking in relevancy and should not have been admitted.

IV.

Harmless Error—Guilt Beyond Reasonable Doubt

The State attempted to attack Dugan's Nicarico statements by showing either that they were unreliable and untrue, or that Dugan participated in the crime along with defendant. To accomplish these dual ends, the State presented the bloodhound evidence to demonstrate inconsistencies in Dugan's Nicarico statements and his version of the crime, and to show that there were multiple offenders, perhaps Dugan (*e.g.*, shoeprint on front door as consistent with his account). The State presented as well the Rodriguez impeachment testimony to establish a Dugan-Cruz connection. While the State was afforded the opportunity to present such inadmissible evidence, the defendant was not allowed to rebut it with admissible evidence.

The State maintains that any error with respect to Rodriguez's impeachment and the admission of bloodhound evidence must be considered harmless. We do not agree. As we have stated previously, with the admission of Dugan's Nicarico statements, the State's case became significantly dependent on the theory that defendant and Dugan were joint participants. Without Rodriguez's impeachment evidence, only the self-interested testimony of Turner, a convicted murderer and sex offender, supported the theory that Dugan participated with defendant. Further, the evidence against defendant was not overwhelming. (*People v. Cruz* (1988), 121 Ill. 2d 321, 335 (harmless error not found as "[t]he evidence against defendant was not overwhelming").) Turner's testimony offered the primary distinction between the State's case at defendant's first trial and this trial. Certainly,

Turner's testimony did not significantly add to the weight of the evidence against defendant at this trial. Because the evidence of defendant's guilt is not overwhelming, errors which occurred have greater significance than would otherwise have been the case. And because we cannot say beyond a reasonable doubt that these errors did not affect the verdict (*People v. Wilkerson* (1981), 87 Ill. 2d 151), reversal is required. A review of the admissible evidence reveals, however, that the evidence was sufficient to support a finding of guilt beyond reasonable doubt. (See *People v. Taylor* (1979), 76 Ill. 2d 289, 309-10.) We are not in disagreement with the dissenters on this score. Accordingly, defendant faces no risk of double jeopardy and may be retried.

We next address two issues likely to recur at trial.

## V.

### Evidence Concerning Change in Prosecution Theory

Dugan's Nicarico statements indicated that he murdered the victim on the Prairie Path, near where the body was found. The State attempted to persuade the jury that Dugan's statements were not credible and so advanced the position that the murder did not occur on the Prairie Path. Defendant contends that the trial court abused its discretion by preventing him from introducing evidence showing that the State had taken the opposite position at his earlier trial. (See *People v. Hernandez* (1988), 121 Ill. 2d 293, 306 ("According to the State, *** the victim was murdered where she was found").) Defendant sought to examine the previously assigned assistant State's Attorney concerning his opening statement at defendant's first trial that "substantial quantities" of blood on the Prairie Path indicated the victim was killed there.

Relevant admissions of a party, whether consisting of a statement or conduct, are admissible when offered

by the opponent as an exception to the hearsay rule. (*Gillson v. Gulf, Mobile & Ohio R.R. Co.* (1969), 42 Ill. 2d 193, 197.) Traditional agency principles govern whether the statement of an agent is an admission of the principal. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 802.9 (5th ed. 1990).) An attorney may act as an agent and as such make admissions against his or her principal. (*Haskell v. Siegmund* (1960), 28 Ill. App. 2d 1; see also *United States v. McKeon* (1984), 738 F.2d 26, 30.) And Illinois courts have implicitly stated that an attorney's statements during trial argument may constitute admissions. (See *Standard Management Realty Co. v. Johnson* (1987), 157 Ill. App. 3d 919, 924; *Drell v. American National Bank & Trust Co.* (1965), 57 Ill. App. 2d 129 (same); *cf. McKeon,* 738 F.2d at 30.) What constitutes an admission, however, is a matter of case-by-case analysis. See *People v. Morrison* (1988), 178 Ill. App. 3d 76; *Schall v. Forrest* (1977), 51 Ill. App. 3d 613.

Clearly, according to these authorities, the statements at issue here constituted evidentiary admissions. There can be no question regarding the assistant State's Attorney's authority, and the statements were not merely conjectural as to where the murder occurred. As such, the statements' general admissibility is accepted. However, we have found no Illinois case on point concerning whether counsel's admissions during argument at an earlier trial are admissible as evidence at a subsequent trial of the same matter. Defendant cites to several authorities. With the exception of *McKeon*, 738 F.2d 26, and *United States v. Salerno* (2d Cir. 1991), 937 F.2d 797, we find them to be either unpersuasive or distinguishable. See *Finley v. Kesling* (1982), 105 Ill. App. 3d 1; *United States v. GAF Corp.* (2d Cir. 1991), 928 F.2d 1253, 1260.

In *McKeon*, defense counsel represented in opening

statement at a prior trial that the defendant's wife had not used her employer's Xerox machine. At the subsequent trial, defense counsel depicted the wife quite differently. The trial court ruled that the defense counsel's opening statement at the first trial was admissible as an admission under Federal Rule of Evidence 801(d)(2). The *McKeon* court concluded that there existed no *per se* rule against the admission of the defense counsel's inconsistent opening statements. *McKeon* held, however, that the evidentiary use of such statements must be closely circumscribed to avoid conflict with important policies. See *McKeon*, 738 F.2d at 32 (discussing considerations of diversion from issues, marginality, prejudicial inference, chilling effect on vigorous advocacy, exposure of work product, trial tactics or legal theory, etc.).

We share these concerns and, no doubt, so did the trial court here. While *McKeon* developed a rather elaborate series of rules to test admission of the evidence, we cannot say the trial court here abused its discretion in refusing to admit this evidence, given the significance of the apparent concerns as well as the lack of binding authority on the issue.

## VI.
### Impeachment of Steven Pecoraro

Defendant asserts that the trial court erred in prohibiting him from cross-examining Steven Pecoraro about the details of Pecoraro's convictions. Defendant contends that he was deprived of his right to meaningfully impeach Pecoraro and, therefore, his constitutional right to confront the witnesses against him was abridged. We disagree.

Steven Pecoraro had been convicted of stealing human body parts, including sexual organs, from a chiropractic school. Prior to trial, the trial court granted

the State's motion *in limine* to prevent the defense from eliciting this information on cross-examination. On direct examination at trial, Pecoraro testified that, when he and defendant were in jail together, defendant had related his involvement in the Nicarico kidnapping and murder. Pecoraro also testified that he had been convicted of theft, burglary, robbery and had received psychiatric treatment.

On cross-examination, Pecoraro again admitted his convictions and psychiatric treatment. He denied receiving any special benefits in exchange for his testimony. In response to defense counsel's query about whether he was currently under psychiatric care, Pecoraro replied that he was told by the "psychologist" that he was "perfectly normal." Defense counsel then attempted to cross-examine Pecoraro concerning the reasons for his psychiatric treatment. The State's objection to this line of questioning was sustained. Defendant asserts that Pecoraro's response opened the door to cross-examination concerning the details of his convictions.

The scope of cross-examination concerning the circumstances of a witness' prior convictions is within the trial court's sound discretion, and, absent an abuse of that discretion which results in manifest prejudice to the defendant, the ruling will not be overturned on review. (*People v. Boclair* (1989), 129 Ill. 2d 458, 477-78.) Although the prosecution may open the door on direct examination by inquiring about a witness' past convictions, limits may be placed on the scope of cross-examination once the door has been opened. "The opening is not a funnel through which the circumstances of prior convictions can be poured." (*Boclair*, 129 Ill. 2d at 478.) The basis for this prohibition is the avoidance of collateral and extraneous issues.

Somewhat similarly, this court has also held im-

proper the direct examination of the prosecution's own witness concerning details of the witness' past convictions. (*People v. DeHoyos* (1976), 64 Ill. 2d 128, 132-33 (prosecution's eliciting details of prior convictions from own witness, who had associated with defendant, held improper).) The basis for recognizing these limits was that the prejudicial effect of such evidence outweighed its probative value.

Defendant asserts that, nonetheless, evidence which would ordinarily not be admissible to impeach becomes admissible to rebut affirmations made by a witness. Defendant relies on *People v. Bey* (1969), 42 Ill. 2d 139, *People v. Nastasio* (1963), 30 Ill. 2d 51, and *People v. Ford* (1987), 163 Ill. App. 3d 497. He contends that Pecoraro's response that he was "perfectly normal" constituted an affirmance which was properly rebuttable with evidence concerning the details of his convictions.

The cited authorities concern instances where defendants testified on direct examination about certain convictions and then either asserted (*Nastasio*) or implied (*Bey*) that they had no other convictions. *Ford* concerned an instance where the defendant gratuitously asserted both on direct examination and under cross-examination that he had never committed a certain crime. In each instance, the defendant was considered to have opened the door to his impeachment. In the present case, however, we are not concerned with an attack upon a defendant's credibility, but with an attack upon a witness' credibility. Furthermore, we cannot say that Pecoraro's response to the defense's cross-examination was either gratuitous or an affirmation. A defendant cannot seek to evade the court's ruling by asking a question which elicits a certain response and then assert that the witness has "opened the door" to that particular subject.

This court has found no abuse of discretion where

either the jury was informed of a witness' prior convictions and any benefits received in exchange for testifying (*People v. Brisbon* (1985), 106 Ill. 2d 342, 362), or was in the position following testimony and probing cross-examination to judge the witness' demeanor and credibility (*Boclair*, 129 Ill. 2d at 478). The jury here was fully advised that Pecoraro had been convicted of several crimes and had received psychiatric treatment. The jury was also provided the opportunity to fully assess Pecoraro's demeanor and credibility as he underwent extensive cross-examination. Under these circumstances, we find no abuse of discretion in the exclusion of evidence concerning the macabre details of his past convictions.

### Conclusion

We are profoundly aware of the impact our decision will have upon Jeanine Nicarico's surviving family and friends. We are not insensitive to their personal anguish and tragedy. Not only have they suffered the unspeakable nightmare of her loss, but they are denied closure by our justice system, again and again. We deeply regret any role we play in prolonging their struggle and grief. Yet, we are duty bound to play a larger role in preserving that very basic guarantee of our democratic society, that every person, however culpable, is entitled to a fair and impartial trial. We cannot deviate from the obligations of that role. The resulting loss to our *entire* society would be too great.

Accordingly, we reverse defendant's convictions and sentence and remand for a new trial.

*Reversed and remanded.*

JUSTICE NICKELS, concurring:

I agree that the trial court erred in excluding evidence concerning Dugan's other crimes and I therefore join in the judgment granting Cruz a new trial. However,

I write separately because I believe the plurality mechanically applies the evidentiary rules regarding other-crimes evidence and thereby places unnecessary obstacles in front of the truth-seeking function of the trial. In particular, the plurality requires the same degree of similarity between the charged crime and other-crimes evidence regardless of whether the State or the defendant proffers the evidence. In my opinion, once a third party's confession is admitted as substantive evidence under *Chambers*, admission of that person's other crimes should not focus solely on similarity, but on concerns of relevance, jury confusion, and undue delay in the trial.

The rules of evidence are designed to secure fairness, prevent prejudice, and foster the ascertainment of truth. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 102 (5th ed. 1990).) Evidence of other crimes is inadmissible for the purpose of showing a propensity on the part of the defendant to commit crimes. (*People v. Lampkin* (1983), 98 Ill. 2d 418.) The justification for the rule is defined in terms of prejudice to the defendant. The danger is that other-crimes evidence "over-persuades the jury, which might convict the defendant only because it feels he or she is a bad person deserving punishment." *People v. Lindgren* (1980), 79 Ill. 2d 129, 137.

The plurality concedes that in cases where a defendant seeks to introduce other-crimes evidence to exculpate himself there is no need to balance the probative value of the evidence against any prejudicial effect. (162 Ill. 2d at 350.) However, the plurality still requires the same degree of similarity between the other crimes and the charged crime as if this were a case where the danger of prejudice to the defendant must be overcome. First, the plurality concludes that the Ackerman murder was sufficiently similar to the Nicarico murder to

justify admission under a *modus operandi* theory. The plurality requires the same rigid similarity that would be required if the State were attempting to prove the existence of a common offender based only on the similarity of the crime. Second, the plurality concludes that the evidence of Dugan's other crimes was sufficiently similar to the charged crime to corroborate his statements regarding the Nicarico murder.

In contrast, Justice McMorrow and Justice Heiple, joined by Chief Justice Bilandic, argue in dissent that the strict factual similarity requirements for other-crimes evidence were not satisfied in this case. These Justices would exclude the evidence of Dugan's other crimes on this basis.

I do not believe that factual similarity between the charged crime and the other crimes is the appropriate focus for determining whether to admit other-crimes evidence of a nondefendant. I agree with the plurality that where a defendant seeks to introduce evidence of other crimes to exculpate himself, there is no need to balance the probative value of the evidence against any prejudicial effect. (162 Ill. 2d at 350.) However, the corollary to that proposition is that the other-crimes evidence must be admissible where it has any probative value that is not outweighed by some other consideration, such as jury confusion or delay. I share the view regarding similarity expressed by the Supreme Court of New Jersey in *State v. Garfole* (1978), 76 N.J. 445, 452-53, 388 A.2d 587, 591:

> "[A] lower standard of degree of similarity of offenses may justly be required of a defendant using other-crimes evidence defensively than is exacted from the State when such evidence is used incriminitorily [*sic*]. As indicated above, other-crimes evidence submitted by the prosecution has the distinct capacity of prejudicing the accused. Even instructions by the trial judge may not satisfactorily insulate the defendant from the hazard of the jury using

such evidence improperly to find him guilty of the offense charged merely because they believe he has committed a similar offense before. Therefore, a fairly rigid standard of similarity may be required of the State if its effort is to establish the existence of a common offender by the mere similarity of the offenses. [Citations.] *But when the defendant is offering that kind of proof exculpatorily, prejudice is no longer a factor, and simple relevance to guilt or innocence should suffice as the standard of admissibility, since ordinarily, and subject to the rules of competency, an accused is entitled to advance in his defense any evidence which may rationally tend to refute his guilt or buttress his innocence of the charge made."* (Emphasis added.)

Thus, absent the danger of prejudice to a defendant, the only remaining considerations are whether the evidence of other crimes is relevant and whether the probative value of this relevant evidence is outweighed by a danger of jury confusion or undue delay of the trial. (See also *United States v. Aboumoussallem* (2d Cir. 1984), 726 F.2d 906, 912 (applying same analysis for other-crimes evidence proffered by a defendant under Federal Rule 404(b)).) Similarity between the charged crime and the other crimes becomes a consideration only to the extent that it is one means of finding the other-crimes evidence relevant.

The plurality refuses to relax the similarity requirement for admission of other-crimes evidence where the evidence is proffered by a defendant. The plurality supports this decision based on this court's decision in *People v. Tate* (1981), 87 Ill. 2d 134. However, a close reading of *Tate* and the cases on which it relied shows that relevance and not factual similarity is the appropriate inquiry.

In *Tate*, the defendant was charged with various offenses that arose from his attempt to steal meat from a convenience store. The defendant's theory was that another man committed the crime. Defendant's theory was based on a subsequent similar crime committed by

that man and an alleged confession by him. However, unlike Dugan's confession, the confession in *Tate* was found not to be sufficiently corroborated under the *Chambers* standard and was not admitted as substantive evidence. (*Tate*, 87 Ill. 2d at 144.) The defendant attempted to admit the other-crimes evidence of the third party under a theory of *modus operandi*.

This court found that the other-crimes evidence was inadmissible because there was no "substantial and meaningful link" between the other-crimes evidence and the charged crime. (*Tate*, 87 Ill. 2d at 143.) This standard is a relevance standard defined in terms of the strength of the connection between the crimes, of which similarity is but one factor. In *Tate*, there was no other link between the charged crime and the other-crimes evidence of the third party besides their similarity, as the alleged confession was found unreliable. In such a case, there must be a high degree of similarity before the other-crimes evidence becomes relevant. Obviously, where a defendant attempts to raise a reasonable doubt as to his guilt based on no more than the occurrence of a similar crime committed by someone else, a high degree of similarity is necessary before the other crime could be considered relevant.

Further support for the position that similarity is but one factor in determining whether there is a substantial and meaningful link between the other-crimes evidence and the charged crime is found in the case from which *Tate* borrowed that standard. This court in *Tate* quoted at length from *Commonwealth v. Keizer* (1979), 377 Mass. 264, 385 N.E.2d 1001, in which a defendant was accused of participating in a robbery with two other persons. In *Keizer* the defendant attempted to prove he was not one of the three who committed the robbery by introducing evidence that the person thought to be his accomplice committed a subsequent robbery

with two other people. The trial court excluded evidence of the subsequent crime because the "facts were not closely related to the facts of the case against the defendant." *Keizer*, 377 Mass. at 266, 385 N.E.2d at 1003.

The Massachusetts Supreme Court reversed. The court recognized that some of the similarities in the crimes were common to many robberies in the Boston area. (*Keizer*, 377 Mass. at 267, 385 N.E.2d at 1004.) The court also noted that there were discrepancies in the descriptions of the assailants in the two robberies. (*Keizer*, 377 Mass. at 268, 385 N.E.2d at 1004.) However, the court reversed because the participation of one of the defendant's alleged accomplices in a second robbery with two other people established the necessary link between the two crimes. (*Keizer*, 377 Mass. at 268, 385 N.E.2d at 1004.) As defendant did not participate in the second crime, this evidence was relevant to his participation in the first crime and should have been admitted despite the lack of any distinguishing characteristics of the two crimes.

Thus, there was a substantial and meaningful link found in *Keizer* between the other-crimes evidence and the charged crime where factual similarity was but one factor. As in *Keizer*, there are significant factual similarities in the present case between the charged crime and the other-crimes evidence which are pointed out by the plurality. However, I agree with the dissenters that there are no distinctive common features that would earmark both crimes as the handiwork of the same criminal. Such a finding is not fatal to whether a sufficient link exists. In *Keizer* there were also no distinctive common features between the charged crime and the other-crimes evidence. (*Keizer*, 377 Mass. at 268, 385 N.E.2d at 1004.) The appropriate analysis is to apply factual similarity as one factor in determining whether a sufficient link exists between the charged crime and the other-crimes evidence.

Applying these considerations, evidence of Dugan's other crimes should be admitted if relevant. Evidence of Dugan's other crimes is relevant if there is a sufficient link between that evidence and the Nicarico murder such that the defendant's guilt is made more or less probable. The degree of factual similarity between the charged crime and other-crimes evidence is one factor to consider in determining whether a sufficient link exists.

Dugan's confession in and of itself provides the necessary link between Dugan's other crimes and the Nicarico murder. The facts of Dugan's other crimes are relevant as corroboration of his confession to the Nicarico murder. The facts of Dugan's other crimes are relevant because, if he was telling the truth in regard to those other crimes, it is more likely he is telling the truth regarding the Nicarico murder.

The similarity between certain elements of the Nicarico murder and other crimes Dugan has admitted committing bolsters the connection between the crimes. In both the Nicarico and Ackerman murders, the victims were young Caucasian girls abducted during daylight hours. Both victims' hands were likely tied and they were anally raped. The other crimes shared some similarities with the Nicarico murder, including sexual assaults taking place in the back seat of a car, one involving a tire iron, and another blows to the head. While these similarities are all insufficient to show *modus operandi*, the similarities are factors along with the confession in finding a sufficient connection between Dugan's other crimes and the Nicarico murder.

In addition, the evidence of Dugan's other crimes is also relevant to show he is capable of the heinous nature of the Nicarico murder. There is no prejudice to Dugan, as he is not on trial. Also, the propensity rule simply has no application where there is a confession of a third party, as the danger of the inappropriate inference is

eliminated by the act of confessing to the crime. Moreover, there is no prejudice to the defendant in the admission of other-crimes evidence of another person who confessed to the crime for which defendant is charged. As the plurality notes, other-crimes evidence is " 'objectionable "not because it has no appreciable probative value, but because it has too much." ' " (162 Ill. 2d at 348, quoting *People v. Romero* (1977), 66 Ill. 2d 325, 330, quoting *People v. Lehman* (1955), 5 Ill. 2d 337, 342.) Where there is no danger of prejudice, I see no reason to deny the trier of fact such probative and relevant evidence.

The evidentiary rules regarding other-crimes evidence were born out of the need to protect the innocent from being convicted on the basis of past crimes. I cannot agree with the mechanical application of these rules to the present case. Once a confession is found sufficiently corroborated to be admitted as substantive evidence, I would find the evidence concerning the confessor's other crimes admissible on the basis of relevance alone.

JUSTICE HEIPLE, dissenting:

Over 11 years have passed since February 25, 1983, when 10-year-old Jeanine Nicarico was abducted from her home, raped, sodomized, and bludgeoned to death. Her murderer, Rolando Cruz, has twice been convicted by a jury and twice been sentenced to death. As was brought out at both trials, he had admitted his guilt to others on various occasions. Cruz, however, declined to testify to contradict any of the evidence against him. Today this court reverses his conviction and death sentence for the second time. The rationale for this reversal rests on three purported errors that occurred during the second trial. These claims of error are without merit. Thus, I dissent.

It is of passing interest that the conviction and

sentence in the second trial of this case which we now consider were initially affirmed by a divided court on December 4, 1992. Thereafter, the composition of this court changed with the retirement of three Justices and their replacement with three new Justices. Defendant then filed a petition for rehearing and a carefully orchestrated and well-executed extrajudicial campaign was undertaken in defendant's behalf. Feeds were given to persons in the media and stories began to appear in print and on television questioning the guilt of the defendant. A curious melange of religious leaders, law school deans, former prosecutors, special interest bar associations and law professors suddenly surfaced and filed a variety of *amicus* briefs in support of defendant's petition for rehearing.

For many in the group, possibly even a majority, the solicitation to join this *amicus* crowd was not a hard sell, as they were already firmly opposed to the death penalty in any case, and regardless of whether it applied to the defendant Rolando Cruz or to anyone else.

The *amicus* former prosecutors included among their number the lawyer and author Scott A. Turow, a person most prominently known for his works of fiction. They argued on policy grounds that a 4-3 decision in a death case erodes the moral authority of the law, and that "the law's ability to command the broad respect of the community is severely pressed" when three members of this court believe the defendant did not receive a fair trial. They did not mention that the defendant has twice been convicted by unanimous juries of 12 persons in separate trials. They also did not mention that the "law's ability to command the broad respect of the community might be severely pressed" when it reverses a second conviction of guilty and sends a murder case back for retrial more than 11 years after the event and at a time when witnesses may be dead or unavailable,

when evidence may be lost and when memories may have faded. Neither did they suggest any other workable rule for a seven-person supreme court than majority rule. They perhaps did not suggest an alternative method since the Illinois Constitution provides that the concurrence of four judges is necessary for a decision. Ill. Const. 1970, art. VI, § 3.

That more than a select few of the persons filing *amicus* briefs in this case could have other than a cursory familiarity with the facts is highly questionable. For the majority, most assuredly, their knowledge is secondhand, partial and incomplete. How many among them took the time to sift through the several thousand pages of transcripts and the numerous exhibits in order to form a knowledgeable judgment? The 24 religious leaders who combined to use their names in a joint appeal to this court, even when considered collectively, do not have the knowledge of this case which is possessed by even one of the jurors who heard the testimony and received the evidence at the trial.

The deans of six of Illinois' nine law schools joined forces in a separate *amicus* brief. Implicit in this brief is the attempt by these law deans to use their good offices, their prestige and their leadership status to influence and sway the court's decision on a factor that is at once irrelevant and improper—that is to say, apart from the merits, to influence the court's decision on the basis of the prestige of the petitioners as law deans and oracles of the law. If it were otherwise, a single concerned law dean could have authorized the separate *amicus* brief. Honorable mention is due to those law deans who were invited but who had the wisdom and ethical sensibilities to reject the invitation to join this questionable cabal.

Justice is not served when public figures, by reason of their supposed prestige or status, importune a court to reach a particular result in a matter wherein they

have no interest in the case beyond that of any other citizen. The trial of an accused murderer is a judicial proceeding which turns solely on the facts and the law applicable to those facts. It is not a public relations campaign. It is not a public opinion poll. It is not a situation where the prestige or status of the petitioner should have significance or application. The test of a verdict and a judgment of guilty is solely its correctness under the law.

In any event, a rehearing was ordered and the new majority on this court now reverses and remands this case for a new trial on the merits. What are the facts?

I. Establishment of Guilt

The plurality opinion[1] authored by Justice Freeman and joined by two other Justices focuses on supposed errors of the trial judge and says very little about the evidence amassed against the defendant. Consideration of that evidence, however, is necessary for a full understanding of this case. What it shows is that the defendant convicted himself by his several out-of-court statements. These ranged from his furnishing of detailed factual information known only to a person involved in the crime to outright admissions that he was the killer. In sum, these statements, together with the other evidence in the case, furnish ample support for the jury's

---

[1]It should be noted that there is no "opinion of the court." On this point, the language this court uses when it delivers a divided opinion can use some clarification. A "special concurrence" is one where the authoring Justice joins both the opinion and the judgment. A "concurrence" is one where the authoring Justice joins only the judgment of the court.

The division of the instant case is 3—1—2—1. Under article VI, section 3, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 3), "the concurrence of four [justices] is necessary for a decision." The only thing four justices agree on today is that reversal is necessary. In terms of precedent, none of the opinions filed in this case has the force of law.

verdict of guilty beyond a reasonable doubt. Detailed summations follow.

Defendant became a suspect when, in hopes of collecting the reward offered, he approached the police with information about the Nicarico murder. On May 2, 1983, Detective Dennis Kurzawa interviewed defendant, who claimed he had received information from a man named Ray Ortega. Defendant told Kurzawa that Ortega and another man, Alexander (sometimes called Alejandro) Hernandez, had kidnapped a little girl during the course of a home invasion in Naperville. The girl had been injured, and Hernandez felt that he "had better finish it." The home invasion had been set up by a person that defendant knew only as "White Boy."

On May 9, 1983, defendant phoned Detective Thomas Vosburgh. He reported that Hernandez fired a gunshot at him because he knew too much about the Nicarico murder. Vosburgh picked up defendant, but could find no evidence of a shooting. Vosburgh took defendant back to the Du Page County sheriff's office.

On the way back to the sheriff's office, defendant began talking with Vosburgh. He was very upset and emotional. He told him that he had had a vision which revealed to him what had happened to the murdered girl in Naperville. He said that Jeanine had been dragged from her house, wrapped in a blanket, and placed in a car. He knew that she had been anally raped, hit on the back of the head so hard that her head left a depression in the dirt, and left in woods near a field. His account was accurate and replete with facts not known to the public. He begged Vosburgh to tell him that his "vision" was incorrect.

Upon arriving at the sheriff's office, he spoke with Vosburgh and Detective Kurzawa, where he reiterated his story about his vision. Again, his account included facts about how Jeanine was murdered that were not

available to the public, and again he begged the officers to tell him it was not true. The detectives spoke with Thomas Knight, the chief prosecutor of Du Page County, because defendant knew too much nonpublic information about Jeanine's murder. Knight decided to put defendant before a grand jury, and set up a date for three days later (May 12).

Cruz spent the night of May 9 at the sheriff's office. The next morning he again spoke with Detective Kurzawa, and at this time expanded on his story. Defendant said that on the previous evening he had been approached by Hernandez about 30 minutes before a gunshot was fired at him. Hernandez had pointed to his head and told defendant that that was where he had hit Jeanine. Hernandez related that at the outset he had not meant to hurt Jeanine, but once he hurt her he felt he had to "finish it." Hernandez also opined that defendant knew too much, and asked, "What good is a dead Chinaman?" Chinaman was defendant's street name. Thirty minutes later someone shot at defendant with a gun. At some point, defendant experienced his vision which told him the unreleased facts of Jeanine's murder.

Defendant also told Kurzawa that he had received information from a man named Emilio Donatlan. Donatlan had told defendant that Ray Ortega had been over at his house on the day of the murder, at which time they were sniffing paint to get high. Hernandez came over with Jeanine, and offered her to Donatlan for sex. Donatlan accepted. The girl began screaming, Ortega told Donatlan to quiet the girl, and Donatlan struck her over the head with a bat. Ortega then kicked Jeanine down the stairs. At some point Jeanine's nose was broken. Hernandez then took her out to the car and drove away with her, and defendant denied knowledge of what happened after that.

While defendant's knowledge of the nature of the attack was damningly accurate, his version of the circumstances surrounding the attack soon proved to be false. The supposed players in the murder were interviewed, and Donatlan's house was searched.

Cruz related this same basic story before the special grand jury that convened on May 12, 1983, except that he did not claim to have come by the information through a vision. Instead, he said he derived the knowledge from talking with Ortega and Hernandez. Outside the presence of the grand jury, Knight asked defendant what he was doing on February 25, 1983. Defendant replied that he was working at the Oasis Whirlpool. However, upon investigation the owner told police that defendant did not begin working there until several months after February 1983.

On May 26, 1983, defendant went out with Dan Fowler to celebrate his birthday. Fowler testified that he picked up defendant, that they purchased some beer, and that they were sitting in Fowler's car when defendant became very emotional and started to cry. Fowler had never seen defendant cry before. Defendant asked Fowler if he had heard about the killing of the little girl in Naperville, and told Fowler that he was there and had been involved but was not the one who killed her. He told Fowler that Jeanine had reminded him of his little sister. He told Fowler that the murder weapon was a baseball bat and that he knew where it was. However, when Fowler suggested that they retrieve it and turn it in to the police, defendant said no. They then went to the house of John Ruiz, whose mother and sister were employed by the Nicaricos as housecleaners.

On June 24, 1983, defendant was again brought before a grand jury, and again asked where he was on February 25, 1983. At this time he changed his alibi, claiming that he was smoking dope all day with Iliana

Garcia, Gracie Martinez, David Hoehn and Joe Schaeffer. Again, this alibi did not pan out.

On July 21, 1983, defendant was brought before a grand jury for the third time. He talked about his conversations with Detectives Vosburgh and Kurzawa, and again related how Jeanine was killed. Once again, he demonstrated knowledge of information not possessed by the general public.

Ramon Mares, a friend of defendant, testified before a grand jury on October 20, 1983. He said that, in March of 1983, he was riding around with defendant in a car when defendant told him that he had been present at the Nicarico slaying, but that he was not the one that killed her. At defendant's trial, Mares limited the extent of the March 1983 discussion. Mares testified that defendant became very upset and began to cry, which was unusual for defendant. Defendant told him to "promise not to tell anyone. I know who killed the little girl in Naperville. I know who did it." Mares then asked him how he knew, and whether he was present at the murder. Defendant's reply was inaudible.

On November 21, 1983, defendant, who was then confined to the Du Page County jail, talked with Steven Ford, a fellow inmate. He told Ford that he "kind of" killed a girl in Aurora. He also said that he had stashed something "in the woods."

On March 13, 1984, defendant asked to speak with the lieutenant in charge of the Du Page County jail, Robert Winkler. He told Winkler that Hernandez and Stephen Buckley had approached him to commit a burglary in Naperville. He declined, but hot-wired a car for them. Hernandez called him two days later, and asked him if he wanted to have sex with a little girl. Again, Cruz declined. Hernandez then indicated that he would dispose of the vehicle that Cruz had hot-wired.

In November 1984, defendant had many conversa-

tions with Steven Pecoraro, another inmate in the Du Page County jail. Defendant told Pecoraro that he, Hernandez and Buckley had broken into the Nicarico house, they abducted Jeanine, and took her to an abandoned house. They took the girl, who was screaming and crying, upstairs. Hernandez put two fingers into her vagina. He told him that she was killed because, once they had taken her, it was too late to let her go because she could identify them.

Pecoraro also testified about an incident that occurred one morning in February 1985. Defendant came into a common area shared by defendant, Pecoraro, and others, and was in a good mood. He was singing, "Ooh little Jeanine," and he bragged that he was going to write a book called "How to Kill Little Girls, or Five Ways to Crush a Skull."

In late summer and early fall of 1987, while an inmate in the Menard penitentiary, defendant had several conversations with Robert Turner, another inmate. On at least one of these occasions, defendant related how Jeanine had been killed. He gave basically the same story that he gave to Pecoraro except that he told him that Brian Dugan was also involved. Defendant told Turner that he had tried to "scam" the reward money from the authorities by telling them that he had received a vision of how Jeanine had been murdered. At that time defendant also told Turner that "it was a shame that he had to kill her, because she was the tightest little white bitch he ever had."

In an attempt to discredit Turner's testimony, the plurality improperly reaches outside the trial record and considers, as an impeachment matter, statements made by prosecutors at Turner's own trial. The gist of the statements is that Turner and the State may have made a deal in exchange for Turner's testimony. The plurality opines that the arrangement "clearly impugns

Turner's testimony at defendant's trial concerning any agreement he might have made with the State." (162 Ill. 2d at 330.) However, since defendant chose not to introduce this information at his trial despite its availability, any *sua sponte* weighing done by this court as to the relative credibility of the evidence (a dubious exercise to begin with) should be resolved in the State's favor.

## II. The Dugan Statements

At the heart of the majority's reversal is its resolution of the admissibility of several statements made by Brian Dugan. As elaborated by the plurality, Dugan claims to have murdered Jeanine Nicarico on his own. Dugan, currently serving consecutive natural life sentences without possibility of parole, refuses to testify to this claim without the promise of no further punishment. Not surprisingly, the State has declined his invitation, both for the lack of consideration in Dugan's proposed deal and the desire to not suborn perjury.

Defendant argues that, since Dugan will not testify to his guilt, Dugan's inculpatory hearsay statements are admissible despite the lack of cross-examination or any other means of assuring their reliability. Defendant relies on the statements-against-penal-interest exception to the hearsay rule in support of his assertion. The trial court agreed with this analysis, and allowed the statements into evidence. The majority affirms this ruling.

The admission of these statements is at the very core of the majority's decision to reverse defendant's convictions. Were my colleagues in the majority to conclude (as I think they should) that the Dugan statements should never have been allowed into evidence in the first place, the three errors that form the basis of today's reversal would no longer be relevant. There could be no obligation to supplement the erroneously allowed statements with the other-crimes evi-

dence, the first cited error. The second cited error, the impermissible impeachment of Erma Rodriguez, would likewise be rendered a nullity since she was called only to establish a linkage between Dugan and Cruz. The third cited error, the admission of bloodhound evidence, would also no longer be relevant since it went only to discredit these statements.

As noted by both the plurality and the concurring Justice, the United States Supreme Court and this court have addressed the statements-against-penal-interest exception to the hearsay rule (162 Ill. 2d at 343). The trial court correctly boiled down the law, at least as it applies to this case, into a two-step analysis: whether Brian Dugan's statements were against his penal interest, and if so, whether there were sufficient indicia of reliability surrounding the statements.

The plurality opines that the State conceded the second prong of the analysis. This is not true. In this appeal, the State contends that the statements should not have been allowed into evidence under the statements-against-penal-interest exception to the hearsay rule. Again, in order to be admissible, the two-step analysis as set forth above must be satisfied: the statements must have been against Dugan's penal interest, and there must have been sufficient indicia of reliability surrounding the statements. The State contends that the two-prong test is not met, and cites *United States v. Barrett* (1st Cir. 1976), 539 F.2d 244, 251, and *United States v. Oropeza* (9th Cir. 1977), 564 F.2d 316, 325, "for discussion of this two-pronged test." The State adequately preserved both parts of the necessary analysis of this issue.

The plurality's conclusion that the State waived the second prong of the two-pronged test is wholly gratuitous. There was no waiver of this issue. That is to say, there was no waiver of that part of the test which

requires that there must be sufficient indicia of reliability surrounding Dugan's statements. In implicit recognition of its own error in this regard, the plurality proceeds to a partial, albeit unsatisfactory, discussion on the merits. As is fully set forth below, that discussion will not survive analysis.

### A. Whether Dugan's Statements Were Against His Penal Interest

The first step in determining whether Dugan's statements should have been entered into evidence is to determine whether they were against his penal interest. As noted by the trial court, this is a relatively low threshold. However, the threshold is there, and hearsay statements should be excluded when the threshold is not met. Such is the situation in the instant case.

In the fall of 1985, Brian Dugan was arrested in connection with the murder of Melissa Ackerman. After his arrest, Dugan approached the police and told them that he was willing to give them information about other rapes and murders he had committed if the prosecutors in the relative counties would agree to forgo the death penalty.

Pursuant to this offer, nine sessions were had, beginning with the November 13, 1985, discussion referred to in the plurality opinion, where various authorities obtained information from Dugan. (162 Ill. 2d at 332.) In every session, Dugan either conditioned his information on the agreement that it could not be used to procure the death penalty against him, or when the authorities who could enter into such an agreement were not present, he offered the information in hypothetical terms.

Supreme Court Rule 402(f) states that "[i]f a plea discussion does not result in a plea of guilty, or if a plea of guilty is not accepted or is withdrawn, or if judgment on a plea of guilty is reversed on direct or collateral

review, neither the plea discussion nor any resulting agreement, plea, or judgment shall be admissible against the defendant in any criminal proceeding." (134 Ill. 2d R. 402(f).) Since the information given by Dugan at the nine meetings was provided, without exception, either hypothetically or upon the condition that it could not be used to procure the death penalty against him, every statement at issue fell squarely within the scope of Rule 402(f).

The statements Brian Dugan made concerning Jeanine's murder were made under circumstances where a third natural life sentence without possibility of parole was the worst possible result. We may take judicial notice that Dugan will be unable to serve more than one natural life sentence. Whether he is sentenced to a second, or a third, or even a hundredth life sentence, the practical effect is nugatory after the first sentence. Dugan simply has no more time with which to pay his debt to society.

Since statements with no possible adverse consequences, by their very definition, would never be against one's penal interest, this would seem to be the end of the analysis. The plurality, however, has found a way to evade this seemingly inevitable result. It reasons (without a single citation in support) that it is "the qualitative content and circumstances of Dugan's statements, rather than their evidentiary value, which determines whether they were against his penal interest. *** [B]y making such a statement, Dugan was exposing himself to the prospect of criminal prosecution; indeed, that was the whole point in making the statement." Since Dugan's statement alerted Du Page County to start looking for inculpatory evidence against Dugan which could lead to Dugan's prosecution and the imposition of the death penalty, the statements were against his penal interest. 162 Ill. 2d at 345-46.

There are two flaws in the plurality's suggestion to expand the statements-against-penal-interest exception to the hearsay rule. First, it assumes that there will be inculpatory evidence against the declarant for the State to find. In the event a declarant knows that no such inculpatory evidence will be found because he did not commit the crime at issue, he risks nothing by making statements inculpating himself when they will forever be beyond the State's power to use against him.

This suggested expansion of the statements-against-penal-interest exception would swallow the rule by *de facto* creating a *per se* rule allowing the admission into evidence of any claim made by a third party that he committed the crime, regardless of circumstances in which it is made. Any such claim could, in the abstract, lead prosecutors to evidence against the claimant. Given the inability of the State to cross-examine the statements, we should be wary of virtually abandoning the hearsay rule in this context.

In fact, this very case demonstrates why we should be so wary. In the eight years since Dugan made the statements at issue, no evidence has been found to prompt Du Page County into filing charges against him. Indeed, defendant argues to this court that the State should be forced to give Dugan immunity precisely because it appears that no such charges will ever be filed. The State has kept open the possibility of prosecuting Dugan, as is its prerogative. But it is readily apparent that Dugan did not lead the State to any inculpatory evidence by making these statements. The facts of this case demonstrate why an expansion of the statements-against-penal-interest exception to the hearsay rule is unwise.

The second flaw in the plurality's analysis comes from its overreliance on the fact that "by making [the statements], Dugan was exposing himself to the pros-

pect of criminal prosecution; indeed, that was the whole point in making the statement." 162 Ill. 2d at 345-46.

Webster's defines "penal" as "Of or relating to punishment, as for infractions of the law." Someone's penal interests are jeopardized when he can be punished, not merely prosecuted. Statements made that allow for, or even encourage, prosecution with absolutely no chance of punishment are not against a person's penal interest.

Dugan, with the help of his lawyer, skillfully made these statements so that he could in no way be punished for the crimes he claims he committed. Statements made under these conditions are not against one's penal interests.

Because Brian Dugan's statements were in no way against his penal interest, they should never have been entered into evidence. Thus, the failure to allow evidence to bolster these statements, either through corroboration or to establish *modus operandi*, did not prejudice defendant and cannot be deemed reversible error. Nor did the improper impeachment of a witness, called solely to link defendant to the man making these improperly allowed statements, prejudice defendant, since she would not have been called had the statements been excluded. Finally, allowing the improper testimony concerning the actions of bloodhounds is likewise rendered irrelevant, since it went only to show the falsity of Dugan's statements.

### B. The Reliability of Dugan's Statements

Concluding that these statements were not against Brian Dugan's penal interest would end the analysis. However, even if one were to agree with the plurality that the statements were somehow against his penal interest, the statements are not accompanied by sufficient indicia of reliability to bring them within the hearsay exception. Indeed, an examination of the facts

establishes that Brian Dugan wove a fabric of lies at every stage of his Nicarico fantasy.

The plurality correctly points out that this court will not undergo a *de novo* review of evidentiary considerations, instead deferring to a trial court's discretion. However, our general deference to trial court determinations does not put the issue beyond the reach of this court. When a decision is so completely at odds with the facts, this court may take notice and act accordingly. The trial judge's determination in this case is one such decision.

The trial judge did not articulate which factors he felt indicated that Dugan's statements were reliable. Instead, he made a general ruling that, "without highlighting specific facts; in other words, based on the totality of the facts, it is the decision of this Court that there are sufficient corroborating circumstances that allow the statements of Brian Dugan to be permitted during the trials of defendants."

The plurality identifies the following aspects as indicative of reliability: Dugan's general description of the Nicarico house; the drive around during which Dugan was eventually able to find the Nicarico house and the Prairie Path; that Dugan missed work on the day of the murder; a shoeprint on the front of the Nicarico door which was consistent with one of Dugan's variations of the day's events; that Dugan was able to describe the cloth tape used to wrap Jeanine's head; that Dugan's repossessed car was missing a tire jack; that two utility workers saw someone who looked like Dugan driving a car at the time and near the scene of the murder; and that a woman who worked in a church near the Nicarico home claimed she saw Dugan in her office on the day of the murder.

An examination of each of these factors shows that, far from being corroborative, most actually contradict

Dugan's testimony, while many others tend to cast doubt on the statements. Taken together, they cannot reasonably be described as lending any sort of reliability to Dugan's statements. The trial court's conclusion to the contrary was an abuse of discretion.

The first corroborating factor cited by the plurality is that Dugan's description of the Nicarico house was "generally accurate." (162 Ill. 2d at 336.) It states:

> "Dugan's description of the home's floor plan was accurate (stairs near front door, leading to below-ground recreation room; nearby stairs leading to upstairs bedrooms; wooden railing on stairs). Dugan was also able to describe certain features of the Nicarico home: he recounted correctly that there was a brown dresser in Jeanine's bedroom; that there was beige-colored carpeting in the lower recreation room and on the stairs leading down to the room; that the entry way flooring was parquet-like; that the television in the lower recreation room was set apart from other furnishings in the room; that colors in the home were light; that certain doors opened in particular directions; that the bed on which he threw the victim was unmade. (Jeanine's sister testified that she had not made the bed that morning, but had simply covered it with a spread.)" 162 Ill. 2d at 337.

However, most of Dugan's "generally accurate" descriptions are misstated by the plurality. For instance, Dugan was incorrect about the location of the stairways in the house, the color of the carpeting in the rec room, and the location of the television in the rec room. As for his description of the house's colors, Dugan said more than just that the colors in the home were light; he said that there were no dark colors in the house at all. However, the rec room, where the initial abduction supposedly took place, had dark wood paneling and a dark multicolored rug, and would generally be defined as "dark-colored." Finally, Dugan's indication that there was one railing along one of the stairways was inaccurate, since there were two railings along both stairways.

It is true that Dugan described a brown dresser in Jeanine's bedroom (hardly an unusual color for a dresser or an unusual place for a dresser to be), that he knew that the bedroom was upstairs (hardly an unusual place for a bedroom to be), and that his claim that the bed was unmade could be resolved in his favor, since there was conflicting testimony. (Jeanine's mother testified that the bed was made.) This last piece of knowledge is unremarkable, as beds are generally unmade when one spends the day sick in them.

The best that can be said about Dugan's statements is that his more general descriptions fit the Nicarico house, as well as the prototypical two-story house. When pressed for specifics, however, Dugan's descriptions are wildly inaccurate.

Dugan claimed that when he approached the house, he noticed a wrought iron fence or railing along the walkway in front of the house. There was nothing of the kind.

After talking with Jeanine through the door, Dugan claimed, he kicked the door in, one time saying that he used two kicks. When he gave this version of the day's events, he claimed that the second kick was necessary to break through the chain lock. However, there was no chain lock on the Nicarico door.

Upon entering, Dugan claimed, he saw closet doors in the front hall. There are no closet doors in the front hall.

Dugan claimed that he then ran after Jeanine, who had run into the rec room. As previously indicated, the plurality cites his description of the rec room as corroborating; however, it is nothing of the sort. Dugan described patio doors in the rec room, implying that it was on the main level. The Nicarico rec room, being below ground, could not have had patio doors. Anyone who had actually been in the rec room would know that

patio doors are an impossibility. Dugan also stated that there were no dark colors inside the house, only light colors. However, the rec room had dark grain wood paneling. Dugan said that the rec room's carpet was beige; however, the Nicarico rec room had a multi-colored rug.

The plurality also cites Dugan's description of the television set in the rec room as corroborating. Dugan described a console television in the center of the rec room. In fact, the Nicaricos had a portable television on a TV stand in the corner of the room. Far from corroborating his story, this statement only shows that Dugan correctly guessed that there was a television in the rec room. When pressed for a description or a location, he took a shot in the dark and missed completely.

Dugan then claimed to have taken Jeanine upstairs to her bedroom. However, when pressed to describe the floor plan of the house, he could not correctly place the location of either the stairs leading up or the stairs leading down. When asked to describe the stairs, he said that one of the stairways had a wooden railing. In fact, both stairways had two wooden railings.

Upon arriving upstairs, Dugan claimed to have thrown Jeanine upon "the bed," implying that he thought there was only one bed in the room. There were actually two beds in the room. He stated that there was a small nightstand between "the bed" and the bedroom door. There was no such nightstand. In fact, the only accuracy in this shotgun description of the bedroom was that there was a brown dresser in the room, which is again hardly an unusual color or place for a dresser to be.

In short, Dugan was able to give a general description of a two-story house. When pressed for specifics, his description failed in every regard. This description can hardly be described as corroborative.

The plurality next notes that, when driven around the Nicarico neighborhood by police, Dugan was able to locate the house and the approximate site on the Prairie Path where the victim's body was found.

Dugan's ability to identify the Nicarico house is hardly noteworthy. At the time of the drive around, the Nicaricos had a mailbox in the front of the house with their name on it. The police failed to remove this mailbox before conducting the drive around. Dugan's ability to identify the house demonstrates only that he is literate.

As to Dugan's ability to locate the Prairie Path, Dugan's identification did not go as smoothly as implied by the plurality. During the drive around, Dugan missed the Prairie Path and had the officers continue north on Eola Road. He had no idea he was in the wrong place until Eola Road ends in Butterfield. The officers stopped the car and asked Dugan what they should do. He realized that they must have missed the Prairie Path, and directed them to return from where they came. On the way back they passed a sign that said "Prairie Path," and Dugan identified this as the Prairie Path. Again, a remarkable demonstration of Dugan's literacy, but little else.

The plurality next notes that Dugan missed work on the day of the murder. This is true, and would tend to corroborate his versions of the day's events.

Next, the plurality cites as corroborative the fact that a shoeprint was found on the Nicarico front door which was made by a right foot which kicked the door twice. This is consistent with one of Dugan's variations of the day's events. It should be noted that this statement was made at the same time Dugan claimed that the second kick was needed to break through the chain lock on the door. There was in fact no chain lock on the door. Thus, Dugan changed his story in a way that was

more consistent with the facts in general; however, he again failed when pressed for specifics.

The next factor cited is that Dugan correctly described the tape used to wrap Jeanine's head in a towel. This is true and tends to corroborate his versions of the day's events.

The next "corroborative fact" cited by the plurality is that Brian Dugan's car was missing a tire jack. Repossession records do indicate that Dugan's tire iron and jack were missing. This fact is apparently seen as corroborative of Dugan's claim that he killed Jeanine with a tire iron.

Dugan also claimed that he gave the tire iron to Denise Poquette. Denise, and the rest of her family, denied ever receiving the tire iron or jack. Dugan then changed his story, claiming to have left it behind a water heater in the basement of the Poquettes' house. Again, this story did not pan out. Police checked the Poquettes' house, and found no tire iron or jack. Dugan then further amended his story, now claiming that he had put it behind the water heater, but knew it could not be found there because he had later tried to retrieve it but found it missing.

This series of stories suggests that, whatever Dugan was claiming about the tire iron and jack, it was not entirely truthful. As an initial matter, I fail to see how untruthful statements can be seen to indicate the reliability of other statements made by the liar.

More importantly, the absence of the tire iron and jack is simply too tenuous to provide anything in the way of corroboration. No tire iron was ever found that could have possibly been the murder weapon. Further, defendant could not establish that a tire iron was indeed the murder weapon. The best he could do was provide a defense-paid expert witness who testified that a tire iron could not be ruled out as a possible murder weapon.

That witness did not rule out anything as a possible murder weapon. It is significant that defendant could not find a single expert who would testify that Jeanine was in fact struck with a tire iron, which I would suggest is minimally necessary before the lack of a tire iron is considered corroborative.

On the other hand, Dr. Frank Cleveland, the man who performed Jeanine's autopsy and without question a disinterested third party, testified that a tire iron absolutely could not have been the murder weapon, because a tire iron's diameter and width would not fit the pattern of the blows that Jeanine suffered.

Most likely, Brian Dugan identified a tire iron as his murder weapon because he knew it could not be found, and therefore his story could not be proven false. This conclusion is far more reasonable than the supposedly corroborative idea that a tire iron which did not match the blows received by Jeanine, and which was never found, was the murder weapon. There is simply no corroboration here.

The plurality next cites the observations of two tollway workers as corroborating. An examination of their testimony reveals otherwise.

The relevance of this testimony arose from Dugan's claim that, after the murder, he drove to the end of the Prairie Path and turned around. At some point his car, a four-door green Plymouth Volare missing one hubcap, got stuck in the mud. Depending on which variation of the day's events Dugan was giving, he either got out and pushed the car or he opened the door, stayed in the car and rocked the car free with his foot.

The two tollway workers, Frank Kocheny and Roger Seppi, were called by the defense to testify that they saw a white man driving a green car at 2:40 p.m. near the place of the murder. However, the men's testimonies wound up contradicting Dugan's claims, not corroborat-

ing them. First, they established that the car was not Dugan's. Frank Kocheny testified that the car, while green and missing a hubcap, was in fact a two-door Ford Granada and not a four-door Plymouth Volare. He also testified that the car was never stuck in the mud, and that the driver never got out or even stopped the car. Seppi testified that he saw a green vehicle, but would not describe it in any more detail. On cross-examination, he conceded that two weeks after the murder, he had described it as a two-door Ford Granada.

Kocheny went even further with his testimony and unequivocally testified that the driver was not Brian Dugan. The man he observed was a "white male with dark hair, it could have been dark brown or black. It wasn't long. And he didn't have a beard, but he needed a shave. It was like a 5:00 o'clock shadow, maybe two or three days' growth. Kind of a chubby face. I would say medium build." Kocheny, who had seen pictures of Dugan, was then asked whether Brian Dugan was the man driving the car. Kocheny answered definitively "no."

Interestingly, this description is at odds with the description given by Eloise Suk, discussed *infra*; yet the plurality cites both competing descriptions as corroborative.

The only corroborative points between the observations of the tollway workers and Dugan's story is that a green car with a missing hubcap was seen driven by a white male. In light of Kocheny's unequivocal testimony that the driver was not Brian Dugan, that the car did not match Dugan's, and that the driver did not do what Dugan claimed he did, this is not corroborative. In fact, it strongly suggests that there continues to be no one who can place Brian Dugan near the scene of the crime.

Finally, the plurality cites as a corroborating factor that Dugan gave his name to an employee of a church

located within a half-mile of the Nicarico residence on the afternoon of the murder. This is yet another event that cannot be considered corroborative. Indeed, if the event happened as related by the employee (and there are many reasons to think that it never occurred at all, as will be explained), it tends to disprove Brian Dugan's statements by establishing an involuntary alibi. If the employee's statements are true, it would definitively show that the man the tollway workers saw near the scene of the crime was not Dugan.

Eloise Suk testified that on the day of the murder she was employed as a secretary at St. John's Episcopal Church, which is about a half-mile from the Nicarico residence. On that day a man knocked on the door to the office, which was locked. She let him in, and he asked about a job application he had supposedly left with another employee. She told him that there was no job available, but that if he left his name she would put it in the church newsletter. The man wrote down "Brian Dugan" and a phone number with an Aurora exchange.

Suk testified that she kept the paper with his name in her desk for about a year, although shortly after the incident she and the pastor decided not to put it in the newsletter. Thirty-one months after the murder she recognized Dugan when she saw him on television.

Suk recanted an earlier statement that she made to police that the man walked in the office at 2:10 p.m. and left at 2:23 p.m. In her new version, she claimed that the exchange probably occurred between 1:10 p.m. and 1:23 p.m. She thought the latter time period was more accurate because she normally left at 1 p.m. on Fridays, and never during her employment did she stay at work until 2 p.m. on a Friday. Apparently, by this testimony she also meant to recant her earlier statement to Agent Thomas Fischer that this exchange occurred on Wednesday, February 23.

This testimony is at odds with a newspaper interview she gave to Chicago Lawyer, which appeared in April 1989, about nine months before she testified. There, it was reported that "she usually left at 2 on Fridays, but [on February 25, 1983] she had been unusually busy and was running a few minutes late when she heard a knock on the front door of the church. She glanced at the clock, which showed 2:10. She couldn't help thinking that if she had left on time she would not have to deal with whoever this was." (Garrett, *Prosecutors Are Hiding Truth in Nicarico Case, Says Witness*, Chicago Lawyer, April 18, 1989, at 1.) Thus, her understanding of the time frame of that day's events did not change until over six years had elapsed.

Suk's description of the man differed from Kocheny's. While Kocheny described a man with a chubby face and no facial hair, Mrs. Suk described a man with a slim face and, after another change in her story, a man with a mustache. She testified that the man made her nervous, and that when she heard about the Nicarico murder she talked about the man to her family. He did not make her nervous enough or suspicious enough to call the police.

In addition to Suk's recanting several statements made more proximate to the day in question, there are several other inconsistencies which refute any reasonable belief that Suk ever met Brian Dugan. First and most importantly, Brian Dugan has never once mentioned that he went to a church on the day of the murder. He has never once stated that he talked with someone about a job despite several very detailed descriptions of his purported actions on that day. This fact alone refutes the idea that Suk's account corroborates Dugan's statements, because there is in actuality nothing to corroborate. The best that can be said is that it is completely irrelevant, probably a case of mistaken identity.

Further, Suk's testimony is inconsistent with the "corroborating" factor that tollway workers saw Dugan at 2:40 p.m. near the Prairie Path. If Suk indeed saw Dugan, he could not have been the man seen by the tollway workers driving the green car.

Assuming that the original time period given by Suk is true, getting from the church to the Nicarico house (a half-mile away) and then to the Prairie Path (19 minutes away from the Nicarico house) by 2:40 (*i.e.*, in 17 minutes) would be a physical impossibility, even if the abduction, rape and killing could have been performed instantaneously.

However, even taking Suk's change in story at face value, it is unreasonable to think that Dugan could have left the church at 1:23 and performed all the acts he did, including approaching a resident who lived near the Nicaricos to borrow a screwdriver, fixing his car, driving around aimlessly, abducting Jeanine, looking for an isolated spot, driving to the Prairie Path, raping and murdering Jeanine, and be seen driving away at 2:40. Again, Dugan never claimed to have done this; Suk alone offered this deviation from Dugan's purported actions. In fact, none of Dugan's various stories leave room for this transaction. Yet the plurality finds this testimony corroborating.

The sum of the true corroboration of Dugan's statements is this: Dugan missed work on the date of the murder, he correctly described the tape used on Jeanine, and he claimed to have entered the house in a manner partially consistent with the evidence. Even before considering the many inconsistencies of Dugan's statements, these facts alone are simply not enough to establish the corroboration required by *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, and *People v. Bowel* (1986), 111 Ill. 2d 58, under any standard of review. The trial court's ruling to the contrary was an abuse of discretion.

Once the inconsistencies of Dugan's statements are entered into the equation, the false nature of his story becomes manifest. Some of these inconsistencies have already been highlighted, and the plurality gives a minimal concession of their existence. However, a careful review is worthwhile for two reasons: first, the inconsistencies further demonstrate that Dugan's statements are not corroborated in any sense, and therefore should never have been allowed into evidence; second, and more importantly, they affirmatively demonstrate that the murder could not have occurred as Dugan asserts.

To begin with, and as previously alluded to, there are a number of internal inconsistencies in the nine statements given by Brian Dugan. Like most liars, Dugan was unable to keep track of his fabrications. The result is not a single set of events related by Dugan, but rather a series of alternatives.

Initially, when asked why he went into the Nicarico neighborhood, he said it was because his car was not working properly. He later changed this story, claiming instead that he went into the neighborhood because he needed money.

What happened when he arrived in the Nicarico neighborhood? One constant among his several versions is that he borrowed a screwdriver from an elderly lady whose house was a block or two from the Nicaricos'. Despite an exhaustive search, however, police still do not know who this woman is or which house was hers.

Small wonder. Dugan has on different occasions described this house as a dark-colored house, a brick house, a red wood house, and a brown house. Sometimes it was a single-story house, and other times it had two stories. Sometimes there was an attached garage.

Depending on the story, Dugan returned the screwdriver either to the lady from whom he borrowed it or

to her daughter. Sometimes he saw two elderly men in the house, sometimes only one.

What happened when he arrived at the Nicarico house? Again, it depends upon which "reliable" story one relies upon. At first, Dugan said he parked in the driveway. Then, he initially parked in the street but moved the car into the driveway at some point during the abduction. Later, he said he could not remember where he parked.

While inside the house, sometimes Dugan tied Jeanine's hands, sometimes he did not. One time he tied her hands behind her back. Sometimes he gagged her.

Dugan's sexual attack also varies from story to story. Sometimes there was only anal sex, sometimes there was oral sex and anal sex, and sometimes an attempt at vaginal sex was made. Sometimes Dugan could not remember what color Jeanine's panties were. Other times he claimed he could remember what color they were, but then guessed incorrectly.

In the statements that included administering blows by using a tree branch, Dugan sometimes said that he threw the branch about 10 to 20 feet away, sometimes he either dropped it or threw it, and one time he said he left the branch in a ravine near the body. Sometimes he said he could not remember what he did with it. No branch with blood on it was ever found.

After the attack, he said he drove away but his car got stuck in the mud. Sometimes Dugan said he got out of the car and pushed it, while other times he said he opened the car door but stayed in the car, freeing the car by rocking it with his foot.

After the alleged attack with a tire iron, Dugan originally said he gave the tire iron and jack to a person later identified as Denise Poquette. Poquette and the rest of her family denied ever receiving the jack. Dugan then changed his story, claiming that he hid the iron

and jack in their basement behind the water heater near the washing machine. This, too, was proven false. He then claimed that he left it behind the water heater, and later went to retrieve it but found it missing; thus, he did not know where it was.

Finally, Dugan's claim that he killed Jeanine is inconsistent with a letter he wrote while in jail, where he referred to defendant and Alejandro Hernandez (a man accused of assisting defendant in Jeanine's murder) as "those baby killers from Naperville." Hardly the words of the man who did the killing.

Dugan's story is more than inconsistent with itself. It is also inconsistent with the facts.

Dugan claimed that Jeanine had two coats of toenail polish on, which he remembered because her feet were beside him when he sexually assaulted her. He claimed that there was a base milky coat, and a shiny coat on top of that. However, Jeanine had no toenail polish on, whatsoever.

Dugan claimed that when he left Jeanine, she was face up. She was found face down, with her body in a condition indicating that this was how her murderer left her. Dugan claimed that when he left her, she was "possibly alive." This demonstrates a lack of knowledge about the nature of the blows. Jeanine probably died instantly, and certainly within a few minutes of the blows. The murderer dragged Jeanine's dead body for a distance, several minutes after she died, as shown by post-mortem scratches. Jeanine's murderer knows that he spent a considerable amount of time handling her corpse. Brian Dugan has demonstrated that he has no such knowledge.

As previously noted at length, Dugan's description of the inside and outside of the house is inconsistent with the facts. Briefly, Dugan incorrectly described the presence of a wrought iron fence, a chain lock on the

door, closets in the front hall, and patio doors in the rec room. He could not identify where either the stairs going up or down were; he incorrectly guessed the rug color in the rec room, the general color of the rec room (bright versus dark), the type of television in the rec room, and the location of the television in the rec room. His description of Jeanine's bedroom missed the mark in every aspect except that she had a brown dresser.

Also as previously mentioned, the screwdriver lady is one consistent element among all of Dugan's versions of the day's events. Yet police have never been able to find anyone in the neighborhood that could have possibly been that woman, despite an exhaustive search which included canvassing every house and interviewing people who had moved out of the neighborhood. Neighbors that had moved as far away as Florida were tracked down. No screwdriver lady was found because, as it has become evident, there is no screwdriver lady.

Despite sometimes claiming to have parked in the driveway, Dugan never saw the bright-yellow sailboat parked in the driveway, which was 8 feet high and 20 to 30 feet long.

Immediately adjacent to the Prairie Path, running the entire length of the Prairie Path, there are huge tension wire towers. These are 60 feet tall, with bases as wide as the length of a car. Dugan said that he never saw them.

There are many more inconsistencies which are not only inconsistent with the facts, but which affirmatively demonstrate that Jeanine could not have possibly been killed in any manner remotely similar to Brian Dugan's stories. At the forefront of these is the location of the murder. Wherever Jeanine was killed, it was not on the Prairie Path. Dr. Cleveland testified that when the blows were administered more than a unit of blood (250 milliliters, the amount ordinarily given in a blood

transfusion) would have immediately gushed out. Yet only a few drops of blood were found on the Prairie Path, all much smaller than a dime. This could not have possibly been where Jeanine was murdered. Dr. Cleveland also testified that the murder weapon was definitely not a tire iron, because the diameter and width of a tire iron would not match the pattern of the blows Jeanine received.

Dugan sometimes claimed that he tied Jeanine's hands and wrapped her in a sheet and carried her out of the house. One time he said he tied her hands behind her back. However, there were scratch marks by the door made by a child's fingers, indicating that Jeanine tried to prevent herself from being taken from the house. Further, an examination of Jeanine's wrists revealed no ligature marks, which would have been there had her wrists been bound.

Finally, in the versions where Dugan mentioned vaginal sex, he claimed that he only attempted it unsuccessfully. However, Dr. Cleveland testified that there was full vaginal penetration. Jeanine's murderer was far more successful than Dugan thought.

### C. Dugan's Motive to Lie

The plurality believes that Dugan's hearsay statements should be before the jury because they possess "sufficient indicia of trustworthiness." (162 Ill. 2d at 343.) However, a damning indication of Dugan's supposed reliability is shown by his own characterization of his motivations in this case.

Milton Burns testified that, on November 25, 1985, he was in a holding cell with Brian Dugan. They were discussing the Ackerman murder and Dugan's natural life sentence when Dugan told Burns that "you'll be seeing me again." When Burns asked what he meant by that, Dugan replied that "he was gonna mess with the State, get back at the State in any way he can. And he

didn't have nothing to worry about because he got life and all they can do is run things concurrent with him. *** [He said,] [a]nything I can do to mess with the State I'm gonna do it. He said everybody is gonna know Brian Dugan. They're gonna see my pictures in the newspapers. I'm gonna be on the news. *** [He said,] when I get to the joint, man, I'm gonna clean death row out, everything." Burns saw Brian Dugan on television in August 1986, in connection with his claims about the Nicarico murder. Burns realized that Dugan had made good on his threat and contacted the authorities.

Brian Dugan's brother, Steve Dugan, also shed some light on Brian Dugan's possible motive. Steve Dugan testified that Brian informed him that he had become a celebrity in his prison for his Nicarico statements, and that prisoners now asked for his autograph.

### D. Ramifications of This Analysis

Since Brian Dugan's statements are unquestionably false, it was an abuse of discretion to admit them into evidence. This conclusion vitiates the three errors cited by the plurality. The first error is the preclusion of evidence concerning Dugan's other crimes as a method of both corroborating these statements and to establish Dugan's *modus operandi*. However, if allowing the Dugan statements into evidence was error, defendant was not prejudiced when he was prevented from bolstering these impermissible statements. This analysis applies to the third cited error as well, the impermissible bloodhound evidence. If the Dugan statements were erroneously allowed into evidence, allowing impermissible evidence which worked solely to discredit the impermissible statements did not prejudice defendant.

Finally, this conclusion would render the improper impeachment of Erma Rodriguez a nullity. Erma Rodriguez, defendant's cousin, was called by the prosecution for the ostensible purposes of establishing a linkage be-

tween defendant and Brian Dugan. Rodriguez had told police that, shortly after the murder, she saw defendant and Dugan together. However, at defendant's trial she actually testified that, although she saw Cruz with a white man, he was definitely not Brian Dugan. She then denied that she had ever seen Dugan and defendant together.

The State then impeached Rodriguez with her earlier statements. It did this despite the fact that Rodriguez had not hurt its case, but rather she had only failed to help it. The plurality correctly notes that such impeachment is improper. 162 Ill. 2d at 366.

However, the State would have had no need to establish a linkage between Brian Dugan and defendant had the Dugan statements been properly excluded from evidence. Indeed, it would not at all have profited the State to try and do so had defendant been prevented from bringing this red herring into this case. Thus, under the appropriate analysis of the admissibility of Brian Dugan's statements, this impermissible impeachment did not prejudice defendant and cannot be seen as reversible error.

### III. The Other-Crimes Evidence

The plurality and the concurring Justice compound their incorrect ruling that Dugan's hearsay statements were properly admitted by finding error with the preclusion of the evidence surrounding Dugan's other crimes. The plurality opines that this preclusion was an abuse of discretion under both *modus operandi* (for the Ackerman murder) and corroboration (for the other four crimes) theories. The concurring Justice agrees with the three justices in dissent that neither *modus operandi* nor corroboration principles, as they are presently understood, would suggest error. However, he would find error by retroactively relaxing the standard of admissibility.

In cases "in which the defendant attempts to use a particular *modus operandi* as evidence that the crime was committed by another person, a separate offense is found to be relevant and admissible as proof of *modus operandi* only upon a strong and persuasive showing of similarity." (*People v. Tate* (1981), 87 Ill. 2d 134, 141.) It is not enough that the crime charged and the other crimes have common features or marks of similarity which might be shared by many other crimes committed by other perpetrators. The logical inference that the perpetrator who committed one crime also committed another crime arises only "when both crimes share peculiar and distinctive common features *so as to earmark both crimes as the handiwork of the defendant.* [Citation.] There must be some distinctive features that are not common to most offenses of that type." (Emphasis added.) *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 486-87.

The plurality pays lip service to this stringent standard when it acknowledges that a "high degree of identity between the other offense and the charged crime is necessary" (162 Ill. 2d at 349) and when it rejects "defendant's assertion that [*People v.*] *Tate* [(1981), 87 Ill. 2d 134, 141] allows for a relaxed degree of identity between the crimes compared when other-crimes evidence is offered by defendant." 162 Ill. 2d at 351.

Unfortunately, the plurality goes on to find *modus operandi* with the Ackerman murder on the flimsiest of factual similarities. It reasons:

"In both of Dugan's accounts of the Ackerman and Nicarico murders, he was aimlessly driving around alone in his auto, smoking marijuana, before he encountered the female, Caucasian child-victim. In neither instance was the crime apparently premeditated or planned. In both accounts, Dugan recklessly abducted the victim during daylight hours, in full view, by perhaps placing the victim

in the front, passenger-side area of his auto. In both accounts, Dugan attempted to hide or cover the victim with some type of bedding (sleeping bag or sheet). Both accounts also involved anal sex and the tying of the victim's hands." 162 Ill. 2d at 351.

I submit that the using of a car to kidnap girls during the day is hardly the "earmark" of any particular killer. This is not the "high degree of similarity" that is anticipated by *Tate*. Were this view to command a majority, and thankfully it does not, any threshold necessary for *modus operandi* evidence would be largely eradicated.

Further, the particulars of the two crimes vary significantly. Like its analysis of the Dugan statements, the plurality hangs its hat on general, loose-fitting facts to show similarities. It necessarily chooses to ignore the details.

These details are cogently articulated by Justice Mc-Morrow in her own dissent (162 Ill. 2d at 434-35), but a brief description of the two accounts is worthwhile at this point. Melissa Ackerman was abducted from a public street by Dugan at a time when he was engaged in no other activity. She was abducted in front of a friend, who was also abducted at the same time but escaped. Jeanine was abducted from her house in a manner that no one could witness (not "in full view," as suggested by the plurality), and was abducted during the course of a burglary. Melissa was never blindfolded, while Jeanine was blindfolded from the time of her abduction until her death.

While in the car, Dugan told Melissa to sit on the floor so that passers-by would not see her, and he unscrewed the passenger door lock so that she could not unlock the door. Neither precaution was taken in the Nicarico story.

The assault on Melissa involved the pair getting out of the car, Dugan taking off all of Melissa's clothes, and

Dugan completely removing his pants, shoes and socks. Only anal sex was attempted. Dugan's alleged assault on Jeanine occurred in the car, involved only minimal removal of clothing, and (sometimes, depending on the version) involved oral, vaginal and anal sex.

Melissa was killed by drowning. Jeanine was bludgeoned to death. After killing Melissa, Dugan hid her body by putting it in a drainage ditch and covering it with rocks. No such attempt was made to hide Jeanine's body. Melissa's body was naked when Dugan left her. Jeanine's body was found still clothed.

In short, the manner of the abductions, the nature of the assaults, the method of the killings, and the methods of body disposal are very different in the Nicarico and Ackerman accounts. To say that the trial court erred when it found that *modus operandi* was not established makes a mockery of the doctrine.

The plurality's remaining analysis fares no better. It concludes that the remaining crimes lacked "a sufficient linkage *** to support admission *** under a theory of *modus operandi*, [but nevertheless] there was a sufficient degree of similarity to support their entire admission for purposes other than to show *modus operandi*." 162 Ill. 2d at 352.

The "purposes other" than *modus operandi*, we later learn, are that the other-crimes evidence "corroborate[d] his statements about the Nicarico murder." (162 Ill. 2d at 352.) In support, the plurality cites *People v. King* (1986), 109 Ill. 2d 514 and *People v. Kokoraleis* (1989), 132 Ill. 2d 235.

It should be noted that, if corroboration of the accuracy of Dugan's confession is the rationale for allowing the other-crimes evidence in, the plurality's analysis of the similarities between the crimes is wholly irrelevant. As argued by defendant, at issue under a corroboration theory is the veracity of the confessor. De-

fendant argued that the statements were admissible to show that, since Dugan was telling the truth in the other confessions, he must be telling the truth in the Nicarico confession. The merit of this argument is not dependent on the similarities of the crimes.

It should also be noted that both *King* and *Kokoraleis* are inapposite. In *King*, the defendant was on trial for murder and armed robbery, to which he had confessed. In that confession, he also confessed to a previous armed robbery. The State was allowed to present evidence of the previous armed robbery to show the accuracy of the confession.

Dugan's Nicarico statements, on the other hand, did not include anything concerning the other five crimes. Those statements were entirely separate. Thus, the existence of those crimes does nothing to demonstrate the accuracy of the Nicarico story. Further, the confessions to the other five crimes were given in a *quid pro quo* context, where defendant gave the details in exchange for the waiver of the death penalty. He therefore had reason to be accurate. Since he received nothing for giving the Nicarico statements, he had no similar reason to remain truthful.

In *Kokoraleis*, defendant was on trial for the murder of Lori Borowski. Evidence of two other murders was allowed into evidence under a *modus operandi* theory. The State was also allowed to present evidence that he had voluntary confessed to those two other murders, to support the reliability and accuracy of the voluntariness of his confession to the Borowski confession, which defendant later claimed was coerced. There is nothing remotely similar to the *Kokoraleis* facts in the instant case.

Were the plurality's suggestion that the other-crimes evidence tends to support the veracity of Dugan's Nicarico story to command a majority, the new state of the

law would be that prior truthful statements are admissible to demonstrate the truthfulness of any contested statement. This is not the law, nor should it be.

Besides corroboration, the plurality offers no other "purpose other" than *modus operandi* in support of allowing the other crimes evidence into evidence. As already noted, a corroboration theory of admissibility would not require a finding that the crimes were similar factually. Nevertheless, for whatever reason the plurality offers a description of the "similarities" between Dugan's other crimes and the Nicarico murder. Thus, a demonstration that these crimes were in fact very different is appropriate.

The plurality notes:

"In each murder, Dugan tied the victim's hands at some point. In all of the murders, Dugan availed himself of whatever physical material (water, tire iron, tree branch) was immediately at hand for use as a murder weapon. Several of the crimes, like the Nicarico murder, involved sexual assaults in an auto, blindfolding, tire irons, blows to the head, and the use of bedding materials. Two of the three murders involved blunt trauma, and two of the three involved drowning. Every crime involved the use of an auto to abduct the victim, and every crime involved the abduction of a young, Caucasian female. Although each crime does not bear the same similar feature, various similar features are repeated. The greatest similarity between the crimes, however, lies not in discrete and observable facts, but in the character of the assaults as a whole. [Citation.] The crimes appear unpremeditated, highly spontaneous, and reckless in their regard to possible apprehension." 162 Ill. 2d at 352.

To begin, we should not take refuge in amorphous suggestions that a requisite similarity is most easily found not in discrete and observable facts but in some undefined character of the assaults taken together. This is especially true when, as in this case, an examination of the discrete and observable facts demonstrates that the crimes at issue are indeed very different.

It should also be noted that most of the similarities cited are those that Dugan's other crimes share with each other. It is certainly true that Dugan's other crimes share similar features. They all involved Dugan coming upon females along the road while he was driving, at which time he would abduct them and sexually assault them. These crimes occurred within a short amount of time from each other (four within a month, less than a year after the first, in a time period not proximate to the Nicarico murder).

However, the crimes are very different from the Nicarico account. The plurality's analysis is a little like saying that the Rose Bowl, the Orange Bowl, the Sugar Bowl and the World Series are similar because they all involve either football or baseball. In suggesting their similarities, the plurality necessarily plays. fast and loose with the facts.

For instance, the plurality states "in all of the murders, Dugan availed himself of whatever physical material (water, tire iron, tree branch) was immediately at hand." This is a convenient lumping together of water (the shared method of killing in the Ackerman and Schnorr murders) and a tire iron and tree branch (the purported weapon in the Nicarico murder) which fails to explain their similarity to each other and which ignores the fact that the water used in the Ackerman and Schnorr murders was not "immediately at hand." Rather, Dugan had to drive toward the water, get out of the car and then walk with his victims to get to the water, where he killed them.

The plurality also reports that "several" of the assaults involved blindfolding. In fact, Dugan blindfolded only one of his five other-crimes victims. The plurality reports that "several" of the assaults involved tire irons. However, a tire iron was mentioned in only one of the other crimes, and there it was not used as a weapon.

The plurality reports that "several" of the assaults involved blows to the head. However, only one of the other crimes involved blunt trauma to the head, the Donna Schnorr murder. The source of this trauma is unclear, but Dugan did not claim to have struck her in the head. The trauma may have occurred when he pushed her in the water.

The plurality reports that "several" of the assaults involved the use of bedding materials. Depending on how broadly one defines bedding materials, either none, one or, at most, two of the other crimes involved them: the Ackerman murder involved a sleeping bag, and the rape of C.W. involved a green blanket.

The plurality reports that two of the three murders involved blunt trauma, and two of the three murders involved drowning. The blunt trauma that Schnorr suffered appears to have been coincidental to the murder; it certainly was not the cause of death or the method of killing. Mere coincidences can hardly be deemed corroborative. As far as the drowning is concerned, this goes again to show that the Nicarico murder was different from the rest of the crimes, since no drowning occurred in the Nicarico murder.

Finally, the plurality reports that the crimes all involved young, Caucasian females. However, only one of the five other victims was a child.

In sum, the plurality's finding of reversible error in the trial court's refusal to allow evidence of other crimes which were very different from the Nicarico crime is entirely insupportable.

## IV. Conclusion

Did Rolando Cruz, whether acting alone or in combination with others, really murder Jeanine Nicarico? I express no opinion on the matter. That is a function reserved for the jury. The jurors believed that his guilt had been established beyond a reasonable

doubt. They further believed that justice demanded the imposition of the death penalty on Rolando Cruz. What I do express an opinion on is that the evidence was more than sufficient to support the jury's finding of guilt and the sentence of death. It is my further belief that the defendant received a fair trial and that the claims of error relied on by the plurality and the concurring Justice to support a reversal of the judgment in this case are wholly meritless.

Other errors were claimed by the defendant which even the majority obviously felt were so insignificant or so lacking in merit as to require no discussion. In this connection, it must be noted that there is no such thing as a perfect trial. Perfection is unattainable in this imperfect world. If perfection were the measure, all trials would be reversed in an endless loop since all trials contain some error. So far as evidentiary or procedural errors are concerned, the correct legal test is whether the errors, either singly or cumulatively, deprived the defendant of a fair trial. If the defendant was not so deprived, the verdict and judgment of the court should be affirmed. That is the situation pertaining to Rolando Cruz. His conviction and sentence are supported by the evidence and the law, and the trial was fair. Accordingly, both the guilty verdict and the sentence of death should be affirmed.

Finally, the reversal in this case is not without cost. Though the financial cost will be large, it is the least of the costs that will be incurred. The family of Jeanine Nicarico will be put through the ordeal of reliving the horrible, gruesome and shocking events of February 25, 1983. Eleven years after the murder, witnesses may have died or be unavailable. Memories will have faded. For whatever reason, witnesses may have decided to change their stories. Items of evidence may even have disappeared. New prosecutors will doubtless have to be

assembled who have no familiarity with the case. More, the trial will proceed with instructions from the majority to allow into evidence not only the incompetent hearsay statements of Brian Dugan, but the supposedly corroborating (but also incompetent) evidence of Dugan's other admitted murders. New jurors, free from the effects of the wide media coverage of this case, will have to be selected who, in order to return a verdict of guilty, will have to reach a unanimous verdict. If a single juror can be persuaded that defendant's guilt has not been established beyond a reasonable doubt, the result is a mistrial. Even an acquittal is a possibility.

After two verdicts of guilty and 11 years after the murder, the defendant now gets a third roll of the dice. The pressure on the prosecutor to negotiate a plea to drop the death penalty and reduce the sentence to life or something less—perhaps time served—may be irresistible. In any event, justice is the loser.

For the reasons given, I dissent.

CHIEF JUSTICE BILANDIC joins in this dissent.

JUSTICE McMORROW, also dissenting:

Nine years ago, defendant, Rolando Cruz, was tried before 12 persons who had been accepted by the State and the defense as fair and impartial jurors. Following a trial, that jury returned a verdict of guilty and found that defendant was eligible for and should receive the death penalty. This court subsequently overturned defendant's conviction on the ground that his trial should have been severed from the trials of his codefendants. In 1990, upon remand of this cause, a new jury of 12 persons who had been accepted by the State and the defense as fair and impartial jurors was empaneled. At trial, both the State and the defense presented a substantial amount of evidence on the question of whether or not defendant was guilty of the crimes with

which he was charged. At the conclusion of that trial the jury again returned a verdict of guilty, and then found that defendant was eligible for and should receive the death penalty.

Defendant once again appeals and raises a number of alleged errors as grounds to set aside the jury's findings and award him a third trial. In all of this, a host of legal and factual questions has been debated. All of these concerns are quite valid. Yet it is important to bear in mind the true, core purpose of this appeal. At its most fundamental, the issue in this appeal is whether the defendant received a *fair* trial—not a perfect trial, or the best trial in all possible worlds, but a *fair* trial. Also, the issue is not whether the members of this court of review would have convicted defendant of the crimes for which he was charged and stood trial if we had been called to serve as members of the jury that tried and determined the defendant's guilt, but rather the question is whether sufficient evidence had been presented upon which the jury could have found the defendant guilty.

I have carefully reviewed the evidence of record, the arguments of the defendant and the State, the applicable law, and the views expressed by my colleagues. Contrary to the conclusions of the plurality, the record demonstrates that the defendant did receive a fair trial. I find no sound basis to disturb the jury's verdict that the defendant is guilty of the Nicarico assaults and murder.

There was no abuse of discretion in the trial court's decision to admit evidence that Brian Dugan admitted to having committed the Nicarico assaults and murder, and that Dugan confessed to and was convicted of two other murders and three other sexual assaults. The trial court also properly exercised its discretionary authority when it excluded from evidence the facts and details

surrounding Dugan's confession to the two additional murders and three assaults. The trial court's rulings regarding the impeachment of Erma Rodriguez, as well as the trial court decision to admit the bloodhound trailing evidence, were not reversible error.

Numerous State witnesses testified to various statements made by defendant Cruz in which he either admitted involvement in the Nicarico crimes or recounted certain facts which were consistent with facts discovered during the investigation of these crimes. The jury had the power and right to conclude from the evidence presented through the State's witnesses that the defendant had participated in the Nicarico kidnapping, assault and murder. The jury also had the lawful right and power to conclude that only someone who had participated in committing the Nicarico crimes would have been able to recount the details known to defendant Cruz and described by Cruz in his incriminating statements to the State's witnesses. The evidence presented by the State was sufficient for the jury to find defendant guilty of the Nicarico crimes. The grounds proffered by defendant in support of reversal do not warrant a new trial. I wish to note that the record reveals that defendant was represented at trial by very able counsel.

For these reasons, I dissent from the plurality's decision to reverse defendant's convictions and remand the cause for a new trial. Because I also disagree with some of the views expressed in the dissent of Justice Heiple, I write separately to record my departure from certain identified portions of the dissenting opinion as well as the plurality opinion.

I

One of the most sharply contested issues in this appeal pertains to the admissibility of the hearsay evidence regarding Brian Dugan's admissions to the Nicar-

ico crimes, as well as his confession to two other murders and three sexual assaults. The trial court allowed introduction of the evidence that Dugan admitted that he alone committed the Nicarico crimes. This was a discretionary ruling by the trial court, which is subject to reversal only if the court clearly abused its discretion. (*People v. Bowel* (1986), 111 Ill. 2d 58, 68.) Since defendant sought introduction of the evidence of the Dugan confession to the Nicarico crimes, he does not challenge the trial court's ruling on its admissibility. The State cannot appeal from the trial court's decision to admit the evidence of Dugan's confessions. (134 Ill. 2d R. 604(a); see generally *People v. Young* (1980), 82 Ill. 2d 234.) As a result, the issue is not directly before this court for review on appeal. Nevertheless, the plurality concludes that the trial court's ruling was correct; the other dissenters strongly disagree.

I find no abuse of discretion in the trial court's decision to admit hearsay evidence to show that Dugan admitted that he alone had kidnapped, assaulted, and murdered Jeanine Nicarico. The record discloses that the trial court conducted a full pretrial evidentiary hearing wherein the State and the defense presented considerable factual evidence and made extensive legal arguments in support of their respective positions. After considering the evidence of record and the parties' arguments, the trial court found that Dugan's statements were against his penal interest. The trial court also ruled that corroborative facts and circumstances presented sufficient *indicia* of reliability to justify admission of Dugan's statements that he assaulted and killed Jeanine Nicarico. Although the dissent authored by Justice Heiple disputes these factual determinations, a review of the record reveals adequate factual basis to justify the trial court's ruling.

Most importantly, in my opinion, fundamental

interests of justice, fairness, and the pursuit of truth permitted the admission of Dugan's incriminating statements about his involvement in the Nicarico crimes. (See *Chambers v. Mississippi* (1973), 410 U.S. 284, 302, 35 L. Ed. 2d 297, 313, 93 S. Ct. 1038, 1049; *People v. House* (1990), 141 Ill. 2d 323, 390; *People v. Lettrich* (1952), 413 Ill. 172, 179.) The basic interests of justice, fairness, and the pursuit of truth allowed the introduction of evidence that Dugan admitted that he alone forcibly entered the Nicarico home, kidnapped, sexually assaulted and murdered Jeanine. These same basic interests permitted the introduction of evidence that Dugan correctly described the tape used to bind Jeanine's head, that he led investigators to the Nicarico home, that he led investigators to the approximate location where Jeanine's body was found, and that he accurately described several other significant aspects of the crimes committed upon the child. In my view, it was also proper, in the interests of justice, fairness, and the pursuit of truth, that the trial court permitted introduction of evidence to show that Dugan also confessed to, and was convicted of, the sexual assaults and murders of Melissa Ackerman and Donna Schnorr, as well as three other sexual assaults. The jury did hear all of this evidence. In my opinion, the trial court did not abuse its discretion in these evidentiary rulings.

The paramount fact which permeates all of the issues involving Dugan is the following: *all of the details of Dugan's statements concerning the Nicarico crimes, including his assertion that he alone committed the crimes, and the evidence that Dugan also confessed to two other murders and three other sexual assaults were introduced at trial and heard by the jury.* The jury saw and heard the witnesses, weighed their testimony, and determined the importance to be attached to Dugan's statements before reaching its verdict. The jury heard

and observed the witnesses and examined the exhibits. It had the prerogative to believe or disbelieve some or all of Dugan's incriminating statements. The jury also had the right to believe or disbelieve the witnesses and the evidence that incriminated defendant Cruz in the Nicarico crimes. The evidence considered by the jury included testimony that impeached or attacked the credibility of the State witnesses who recounted the statements made by defendant that incriminated him in the Nicarico crimes.

After weighing *all* of the evidence, the jury found defendant Cruz guilty of the Nicarico crimes beyond a reasonable doubt. By its verdict, the jury did not believe or accept all of Dugan's Nicarico statements as determinative of the issue of defendant Cruz's guilt. By its verdict, the jury indicated it believed Cruz's statements in which he implicated himself in the Nicarico murder.

It is not the function of this court to retry the defendant. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) In criminal appeals, this court is not empowered to set aside the jury's verdict unless the verdict is so palpably erroneous that there is a reasonable uncertainty of the defendant's guilt. (*People v. Harre* (1993), 155 Ill. 2d 392, 397-98.) "Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Collins*, 106 Ill. 2d at 261.) The law compels us in this case, as in every criminal case, to determine whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*Jackson v. Virginia*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct.

at 2789; *People v. Collins,* 106 Ill. 2d at 261.) As already noted, to date 24 impartial jurors have found defendant Cruz guilty beyond a reasonable doubt. Justice Heiple forcefully observes in his dissent that the evidence against the defendant in this case was more than sufficient to support the jury's verdict. (See 162 Ill. 2d at 426.) Considering all of the evidence in this case, I submit that it cannot be concluded that the jury's determination that defendant was guilty was palpably erroneous.

## II

Constrained by the rule that this court cannot reweigh the evidence in order to make a *de novo* determination of the defendant's guilt, the plurality nevertheless gives credence to its own skepticism of defendant's guilt and awards defendant a new trial. To do so, the plurality engages in circuitous reasoning to find that certain decisions of the trial court were reversible error. Specifically, the plurality concludes that the trial court improperly excluded from evidence the details and facts of the other crimes to which Dugan confessed, *i.e.,* the Ackerman and Schnorr murders, and the three sexual assaults. The plurality's decision is patently insupportable.

The trial court's decision to exclude the facts and details of the Ackerman and Schnorr murders and the three other sexual assaults was neither legally erroneous nor an abuse of discretion. Defendant sought to introduce the details of the other Dugan crimes on the sole theory that they were admissible to prove *modus operandi.* The plurality acknowledges that in order to be admissible on this basis, there must be a high degree of similarity between the crimes. This strict requirement is not lessened when the evidence is offered by the defense to show that another person committed the offense charged. 162 Ill. 2d at 351, citing *People v. Tate* (1981), 87 Ill. 2d 134, 141, 143.

The plurality believes that evidence of Dugan's confession to Ackerman's abduction, assault and murder was admissible under a theory of *modus operandi*. Specifically, the plurality finds there was a "substantial and meaningful linkage" between the Ackerman and Nicarico crimes "such that Dugan's confession to the Ackerman murder was probative of the truth of his account of the Nicarico murder." (162 Ill. 2d at 351.) I disagree. A comparison of the Nicarico crimes to the details of the Ackerman crimes does not reveal sufficient similarities to find a *modus operandi*.

The verifiable facts of the Ackerman and Nicarico murders do not share sufficient distinctive features that would demonstrate that both crimes were committed by the same offender. The primary similarities between the Ackerman and Nicarico murders are the following: both victims were female children, both were abducted during daylight hours, both were sodomized, and both were murdered. These shared features are insufficient to prove a distinctive *modus operandi*.

The plurality enumerates several other purported similarities in Dugan's accounts of the two crimes. For example, the plurality notes that prior to the kidnappings, Dugan was aimlessly driving around in his car smoking marijuana when he "encountered" each victim, that he "perhaps" placed each of the girls in the front passenger seat of his car, that he attempted to hide or cover both of them with some type of bedding, and that he tied the victims' hands. (See 162 Ill. 2d at 351.) The plurality accepts Dugan's claims as fact, although none of these particulars was verified. However, even accepting the truth of Dugan's claims on these specific matters, they are not sufficiently distinctive to prove a *modus operandi* on the part of the perpetrator. (See *Tate*, 87 Ill. 2d at 142-43.) The trial court correctly noted that a car is a common mode of transportation in kidnapping cases,

and that sexual assaults often take place in secluded locations. Especially when a car is used in a kidnapping, it is not unusual for the abductor to restrain and conceal the victim from public view.

It is noteworthy that the plurality does not discuss the *dissimilarities* in Dugan's own accounts of the two crimes, or the *dissimilarities* between some of the known facts of each crime. The following are some of the dissimilarities: Melissa Ackerman was abducted from a public street in La Salle County. In contrast, Jeanine Nicarico was kidnapped from inside her locked home in Du Page County, a considerable distance from La Salle County. According to Dugan, the sexual assault of Jeanine took place in the back seat of his car. The assault on Melissa occurred in the clearing of a field. In Melissa's case, Dugan claimed that the assault involved only anal sex. With respect to Jeanine, Dugan stated that she was sodomized and vaginally assaulted. Melissa was drowned; Jeanine was bludgeoned to death. When Melissa's body was found, it was completely unclothed and she was not blindfolded. Jeanine was found with her nightshirt still wrapped around her body and a blindfold taped tightly around her head. The Nicarico murder took place in February 1983. The Ackerman murder was one of four abductions and assaults, or attempted assaults, committed by Dugan in less than four weeks in May and June of 1985.

In light of all of these considerations, the details and facts of the Ackerman murder were not admissible under a theory of *modus operandi*. The record reveals marked differences in: (1) the manners in which the victims were abducted, (2) the nature of the sexual assaults committed upon the victims, (3) the ways in which the victims were killed, (4) the distances between the crime locations, and (5) the conditions of the bodies once the victims were found. In addition, there was a

substantial lapse in time—over two years—between the dates of the Nicarico murder and the Ackerman murder. The record supports the trial court's determination that the high degree of identity between the Nicarico and Ackerman murders required to earmark both crimes as the work of the same offender had not been shown. The trial court correctly ruled that the details of Dugan's confession to the Ackerman crimes were inadmissible at defendant's trial.

Based on the foregoing, I cannot conclude that the trial court abused its discretion in excluding evidence of the facts and details of the Ackerman crime in the defendant's trial for the Nicarico crimes. I agree with the dissent of Justice Heiple that the trial court correctly ruled that the Ackerman murder evidence does not meet the *modus operandi* standard for admissibility. See 162 Ill. 2d at 421.

### III

With respect to the remaining crimes to which Dugan confessed, the plurality *agrees* with the trial court's ruling that there were *not* such distinctive features among all the remaining crimes to which Dugan confessed and the Nicarico murder as to be admissible under the theory of *modus operandi*. The plurality nevertheless holds that "there was a sufficient degree of similarity [between them and his account of the Nicarico murder] to support their entire admission for [other] purposes." (162 Ill. 2d at 352.) The plurality rules, first, that the facts and details of and the circumstances surrounding Dugan's confessions to the Schnorr murder and the other sexual assaults corroborated Dugan's statements about the Nicarico murder and thus were probative of the reliability of his Nicarico statements, and, secondarily, that the evidence was admissible to rebut the alternative theory advanced by the State that Dugan participated with defendant in the Nicarico

crimes. As previously noted, the *only* basis upon which defendant sought to have this evidence admitted at trial was to show Dugan's *modus operandi.*

I do not agree that these other crimes had significantly similar characteristics to the known facts or Dugan's account of the Nicarico crimes. As summarized in the plurality's statement of facts and in Justice Heiple's dissent, the remaining crimes were the abduction, sexual assault and drowning murder of 27-year-old Donna Schnorr in Kane County in July 1984, and the abductions, sexual assaults and attempted kidnapping of three other young adult women ranging in age from 16 to 21 in Kane and Will Counties between May 6 and May 29, 1985. Justice Heiple correctly points out that in all of these crimes the young women were abducted from public roadways, and none involved sodomy. In addition to the other distinguishing features noted by Justice Heiple, two of the abductions occurred late at night, and two others were in the early evening. In only one of the cases was a blindfold used, and the blindfolding occurred only after Dugan had engaged in face-to-face conversation with the victim. In that incident, as well as one other, Dugan drove the victims home after the sexual assaults, and told them his name and where he had gone to high school. Although there are several common features among these other crimes, three of which took place within a three-week time period, they bear almost no similarity to the Nicarico crimes, except that the various crimes involved kidnapping or attempted kidnapping and sexual assaults. Thus, the facts of these crimes do not factually corroborate Dugan's Nicarico statements.

The plurality correctly states that this court should not engage in a *de novo* review of the propriety of the discretionary ruling of the trial court to admit testimony concerning Dugan's Nicarico statements. The plurality

then proceeds, however, to conduct just such a *de novo* review of the trial court's discretionary ruling to exclude evidence concerning the facts and details of other crimes to which Dugan confessed. The plurality holds that the details of the other crimes were probative of the reliability of Dugan's Nicarico statements because they corroborated the Nicarico statements. For the reasons explained above, I do not agree that Dugan's accounts of the other crimes he committed corroborated his statements concerning the Nicarico crimes. Moreover, the trial court had already ruled, at the conclusion of the pretrial hearing, that the hearsay evidence regarding Dugan's Nicarico statements had been shown to be sufficiently reliable to justify its admission. Since Dugan's Nicarico statements had already been ruled admissible, the admission of *additional* hearsay evidence regarding *other* crimes, *unrelated* to and factually *different from* the Nicarico crimes, to support the reliability of a third party's Nicarico statements, was neither necessary nor proper. Highly significant and deserving of emphasis is the fact that at trial defendant did not seek introduction of the details of Dugan's other crimes on the ground that those details demonstrated the reliability of Dugan's Nicarico statements. Defendant sought admission of the other-crimes evidence on the sole basis that the other-crimes details established that Dugan employed a certain *modus operandi* in his commission of crimes which was consistent with the conduct of the perpetrator of the Nicarico crimes.

In his appeal to this court, defendant advances, for the first time, the argument that the details of Dugan's other crimes and the circumstances of his confessions to them was probative of the reliability of Dugan's Nicarico statements. The plurality now gratuitously determines that the trial court should have admitted the evidence of the facts and details of Dugan's other crimes

on a basis (as being probative of the reliability of Dugan's Nicarico statements) that was never raised or argued at trial. Aside from the issue of waiver, I am not persuaded by defendant's newly advanced theory. The plurality's attempt to make a distinction between "corroboration" to support the reliability of Dugan's Nicarico statements and *modus operandi* simply fails.

Neither am I persuaded that the details and facts of the other crimes to which Dugan confessed should have been allowed to rebut the State's alternative theory that Dugan and defendant jointly participated in the Nicarico murder. The plurality admits that Dugan's other crimes were *not* sufficiently distinctive to support the admission of them all under the theory of *modus operandi*, but holds that their probative value is in "the consistency of Dugan's solitary conduct in similar situations." (162 Ill. 2d at 355.) I fail to see the distinction the plurality attempts to make between consistency of conduct in similar situations and *modus operandi*. In my opinion, the attempted distinction is not valid. The Nicarico murder and the other criminal offenses to which Dugan confessed are not "similar situations." The plurality attempts to infer a *modus operandi* of "solitary conduct in similar situations." However, the plurality bases this inference on disparate offenses which, even by the plurality's acknowledgment, are so dissimilar that the rules of *modus operandi* do not apply.

The jury heard testimony that Dugan had been charged with Ackerman's murder and several abductions and sexual assaults in Kane County, that he was also a suspect in the Schnorr murder, and that pursuant to a plea agreement, Dugan confessed to and was convicted of all of those crimes in exchange for natural life sentences for the murders and maximum sentences for the other kidnappings and sexual assaults. In his brief testimony, Brian Dugan admitted that he was

convicted of the murders of Ackerman and Schnorr. Defendant was thus allowed considerable latitude in presenting evidence to support the defense theory he sought to present, *i.e.,* that Brian Dugan was the sole perpetrator of the Nicarico crimes. The plurality engages in a strained and result-oriented analysis to reach the conclusion that the details of Dugan's other crimes should also have been admitted. The plurality analysis is couched in terms of corroboration of the truth of Dugan's Nicarico statements, the consistency of Dugan's solitary conduct, and rebuttal of the State's theory. However, each reason, when reduced to its core, is merely another way of saying that the evidence of Dugan's past conduct should have been admitted to show that Dugan employed a certain *modus operandi* from which it could be inferred that he was also the sole perpetrator of the Nicarico crimes.

I further suggest that the plurality's analysis is wrong because it opens the door to a fundamental problem of significant proportion. Evidence that another person has confessed or admitted his involvement in the crime for which defendant is standing trial is relevant to the accused's defense. But allowing the defense to introduce the *details of other crimes* committed by the third person, where those details *bear no substantial relation or similarity to the crime charged,* will cause a fundamental metamorphosis of the trial itself. An accused may, by properly admissible evidence, show that someone else may have committed the crime for which he is being tried. However, the focus should remain on whether the evidence is sufficient to prove the defendant's guilt beyond a reasonable doubt, not whether a third person can be proven guilty beyond a reasonable doubt.

By permitting the introduction of irrelevant evidence of the dissimilar details and facts of the other

crimes to which Dugan confessed, the plurality essentially places Brian Dugan, rather than the defendant, on trial for the Nicarico crimes. In light of these considerations, the potential for jury confusion is significant and the plurality is remiss to wholly ignore this important factor. For example, in *United States v. Aboumoussallem* (2d Cir. 1984), 726 F.2d 906, cited by the plurality, the court noted that relevant other-crimes evidence may nevertheless be excluded "if its probative value is substantially outweighed by 'the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay ... .' Fed. R. Evid. 403." (*Aboumoussallem*, 726 F.2d at 912.) The reviewing court noted that the trial court had excluded the proffered evidence because of "unfair prejudice and jury confusion," and added that the court was "reluctant to substitute [its] judgment for that of the trial judge." (*Aboumoussallem*, 726 F.2d at 912.) The plurality in the instant case engages in no equivalent analysis, and accords no deference to the discretionary powers of the trial court.

Citing *People v. King* (1986), 109 Ill. 2d 514, the plurality believes that Dugan's confessions to the other crimes were "admissible to corroborate his statements about the Nicarico murder." (162 Ill. 2d at 352.) However, the *King* case is factually inapposite. The crimes at issue in *King*, unlike the case at bar, shared many similar characteristics, including, for example, the use of the same weapon in both offenses. See *King*, 109 Ill. 2d at 531.

The plurality also relies upon *People v. Kokoraleis* (1989), 132 Ill. 2d 235. (See 162 Ill. 2d at 352.) The *Kokoraleis* decision is also inapposite, since the court found the other crimes "shar[ed] a core of facts indicative of a common criminal agency." (*Kokoraleis*, 132 Ill. 2d at 258.) Such cannot be said of the present case.

Lastly, I believe reasoning from this court in *People v. Boclair* (1989), 129 Ill. 2d 458, bears emphasis. In that case, the court restricted the defendant's cross-examination of a witness "to the date and nature, but not the circumstances, of [the witness'] murder conviction." (*Boclair*, 129 Ill. 2d at 477.) Upon review, this court found no abuse of discretion in the trial court's ruling:

"The scope of cross-examination concerning the circumstances of a witness' prior conviction is within the trial court's sound discretion, and absent an abuse of that discretion which results in manifest prejudice to the defendant, the ruling will not be overturned on review. [Citation.] *** [L]imits may be placed on the scope of cross-examination once the door has been opened [to a witness' past offenses]. The opening is not a funnel through which the circumstances of prior convictions can be poured. The witness was not the one on trial and to dredge up the details of his prior conviction would only muddy the waters. [Citation.] The jury, following [the witness'] testimony and the defense's probing cross-examination, was in the position to judge his demeanor and credibility. The trial court's ruling did not interfere with the jury's duty or ability to make those judgments, nor did it prejudice the defendant. Accordingly, we cannot say that the trial court abused its discretion in limiting the scope of cross-examination. [Citation.]" *Boclair*, 129 Ill. 2d at 477-78.

Similar to the circumstances in *Boclair*, the trial court in the present cause properly exercised its discretion when it excluded from evidence the details and facts surrounding the two murders and three assaults to which Dugan had confessed. Dugan was not the accused who was standing trial for the Nicarico crimes, and to include this additional evidence would have only served to "muddy the water." The jury heard the evidence and weighed the importance to be attached to Dugan's statements regarding the Nicarico crimes, as well as Dugan's confessions to and convictions of two

other murders and three sexual assaults. The trial court's ruling that excluded details surrounding the other crimes did not deprive defendant of his right to present properly admissible evidence to support the defense theory that Brian Dugan was the sole perpetrator of the Nicarico crimes. Nor did the court's ruling interfere with the jury's ability to assess the credibility to be given to Dugan's Nicarico admissions. The exclusion of the facts and details of the other crimes to which Dugan confessed did not deny defendant a fair trial. Accordingly, I find no abuse of discretion in the trial court's exclusion of the details and facts of the other crimes to which Dugan confessed.

IV

It is agreed by the plurality and the other dissenters that the impeachment of Erma Rodriguez was error, and the State's proffering of it as substantive evidence in closing argument was improper. The plurality holds that these improprieties rose to the level of reversible error, whereas the other dissenters conclude that they were rendered a nullity by the erroneous admission of Dugan's statements. I find that, although the impeachment evidence was erroneously allowed and improperly used, it did not result in prejudice so substantial as to constitute reversible error.

With regard to the alleged link between Dugan and defendant, Rodriguez consistently testified that she had never seen defendant and Dugan together anywhere, and emphatically denied that she had told either Ramon Mares or Detective Wilkosz that Dugan was the man in defendant's car on Easter 1983, or that defendant and Dugan had "hung around" together when they were younger. She stated that Mares was a second cousin with whom she was not close and whom she had not seen or spoken to in several years. She also testified that she knew Dugan because he had lived in the house

next door to her mother, but that he did not move into that house until July 1984. This fact was confirmed by Wilcosz during his cross-examination, as was the fact that defendant had been incarcerated since the spring of 1984.

The record indicates that the trial court repeatedly admonished the jury of the limited purpose of impeachment evidence. For example, during Mares' testimony, the trial court advised the jury:

"[A]ny evidence that was received for a limited purpose should not be considered by you for any other purpose, and the believability of a witness may be challenged by evidence that on some former occasion he or she made a statement that was not consistent with his testimony in this case. Evidence of this kind may be considered by you only for the purpose of deciding the weight to be given the testimony you heard from the witness in this courtroom."

The trial court repeated these limiting instructions to the jury again during a later portion of Mares' testimony. It also so admonished the jury during Wilkosz's examination, and at the close of the evidence. The jury was similarly instructed during closing arguments and before retiring to deliberate, and was also repeatedly advised that closing arguments are not evidence. It is well recognized that statements by the prosecution during closing argument are ground for a new trial where "the prosecutor's remarks so infected the entire trial proceedings that they denied him a fundamentally fair trial." (*People v. Jones* (1993), 156 Ill. 2d 225, 247.) The trial court's repeated admonitions to the jury, reminding the jurors of the limited effect to be given to impeachment evidence, served to lessen the possibility that the jury would consider the testimony as substantive evidence rather than simply as impeachment evidence against Rodriguez.

Summarizing, I agree that the impeachment of Rodriguez should not have been allowed or argued by the

State as if it were substantive evidence. However, the State also presented Robert Turner's testimony that defendant admitted to Turner that he (defendant), Hernandez and Dugan acted together in the kidnapping, sexual assault and murder of Jeanine Nicarico. Thus, properly admissible evidence independent of the impeachment of Rodriguez was presented to establish a link between Dugan and defendant. Moreover, Rodriguez was resolute and unwavering during her lengthy examination that she never saw or told anyone she saw defendant and Dugan together or knew of any relationship between them. She was similarly resolute in her certainty that the mail-request incident occurred one week before Easter, not in late February. Further, as a result of the strenuous objections by defense counsel in the presence of the jury that the evidence and the State's arguments on it were improper, the jury was instructed several times that the impeachment evidence was to be considered only for the limited purpose of judging Rodriguez's credibility as a witness. Having examined the testimony and arguments on this issue in their entirety, I do not believe that the improper impeachment of Rodriguez was so prejudicial as to have been a material factor in the jury's verdict.

## V

The plurality reaffirms this State's longstanding rule that evidence of animal trailing is inadmissible. (162 Ill. 2d at 369-70.) It is not my position that we should now depart from that precedent. However, I cannot agree that the admission of Towns-end's testimony regarding the bloodhound trailing amounted to reversible error in this case.

Bloodhound evidence is usually offered for the purpose of identifying the perpetrator of a crime. In most jurisdictions admission of such evidence is conditioned, on a case-by-case basis, upon a showing that the

results of the trailing are supported by sufficient independent evidence so as to be reliable and thus probative on the issue of the identity of the offender. (See 162 Ill. 2d at 371-72.) In *People v. Pfanschmidt* (1914), 262 Ill. 411, this court rejected the individualized approach, holding that "the 'conclusions of the blood-hound are generally too unreliable to be accepted as evidence.' " (*Pfanschmidt*, 262 Ill. at 462, quoting *Brott v. State* (1903), 70 Neb. 395, 398, 97 N.W. 593, 594.) The plurality concurs in that determination, but also concludes that even under the individualized approach the dog-trailing evidence in this case lacked the relevancy or probative value necessary for admission. As the plurality correctly observes, the evidence "failed to show any connection with Jeanine's abduction." 162 Ill. 2d at 372.

For example, Towns-end testified that his dogs are not trained to track an actual path taken by an individual but, rather, only to trail scents which are introduced to them. Towns-end conceded that the body cells from which the scents emanate can be dispersed by the wind, thus making it impossible to reconstruct the exact path taken by the person whose scent material the dog is trailing. Towns-end also stated that, in most cases, the dogs are placed at a location or on a path known to be one connected with the crime or the person being pursued. The dogs then follow the scent to which they are directed along that path to an ultimate destination. In contrast, Towns-end stated, in this case there was "no known path"; instead the dogs were searching for paths.

Although Towns-end testified at length regarding the mechanics of the trailing exercises conducted in this case, the sum of his testimony amounted to nothing more than that his dogs travelled the same routes between the Nicarico house and the street after scenting items from Jeanine's bed and the shoeprint on the front

door, and that one of the dogs travelled a slightly different route between the house and a "depression," made by an unknown object at an unknown time, in the lawn. Towns-end acknowledged that by the time he arrived at the Nicarico house, numerous police officers and vehicles were on the scene and in the driveway. Ultimately, and most significantly, Towns-end stated that he merely led the dogs through the procedures and could not say that their actions in any way related to this case.

As such, Towns-end's testimony was irrelevant not only because, as *Pfanschmidt* held, the conclusions of the dogs were unreliable but because the dogs' actions in this case produced no conclusions whatsoever. The entirety of the evidence was ambiguous at best. The State did not show, nor did Towns-end himself even opine, that the dogs' behavior had any connection to Jeanine's abduction.

The defendant argues that the prosecutor improperly exaggerated the nature and significance of Towns-end's testimony. However Towns-end's admission as to the lack of probativeness on the issues of by what route and by what person or persons Jeanine was abducted was also pointedly remarked upon by defense counsel in his closing statement. On the basis of my review of the testimony, the arguments and the instructions, it is my belief that the jury's verdict in this case could not have been influenced either by Towns-end's testimony, which it is agreed was devoid of probativeness, or by the State's hyperbolic argument. Consequently, I would hold that the error in the admission of the evidence relating to bloodhound trailing was harmless.

## VI

In closing, I must record my unequivocal disagreement with the dissenters' views regarding the persons and groups who filed *amici* briefs in this case (162 Ill. 2d

at 387-89). The dissenters' remarks concerning the *amici* are irrelevant, inappropriate, and unjustified. The *amici* were granted leave to file briefs before this court and it is unfair to now castigate the *amici* or to deprecate the positions they advocate. There is no justification for the dissenters' disparaging references to the *amici* as a "questionable cabal" (162 Ill. 2d at 388) or a "curious melange of religious leaders, law school deans, former prosecutors, special interest bar associations and law professors [who] suddenly surfaced and filed a variety of *amicus* briefs" in support of a "carefully orchestrated and well-executed extrajudicial campaign" undertaken to improperly influence this court in defendant's behalf. 162 Ill. 2d at 387.

I disagree with Justice Heiple's remarks in his dissent concerning the law school deans who filed an *amicus* brief before this court. In my view, the dissenters' references to these individuals as "oracles of the law" (162 Ill. 2d at 388) is a caustic denigration of the important roles they play in overseeing the education of future attorneys. There is no foundation for the accusation that the deans "joined forces *** to use their good offices, their prestige and their leadership status to influence and sway the court's decision" on the basis of the irrelevant and inappropriate factor of their prestige. (162 Ill. 2d at 388.) Nothing in the brief submitted by these *amici* suggests such improper motive. Also, I emphatically reject the notion that "[h]onorable mention is due those law deans who were invited but who had the wisdom and ethical sensibilities to reject the invitation to join this questionable cabal." (162 Ill. 2d at 388.) The obvious implication of this comment is that those deans who filed an *amicus* brief lack wisdom and ethics. To my knowledge, the deans of this State's law schools are highly principled and highly ethical individuals. Unfounded remarks which impugn their character and intent are, in my opinion, injudicious and unwarranted.

In addition, while I agree that defendant received a fair trial, I do not believe it is appropriate to speculate on the future of this case in the wake of reversal (see 162 Ill. 2d at 426-27). These matters should have no more bearing on the legal decision of this court than public opinion, the identity of the *amici*, or any of the other matters Justice Heiple correctly states are irrelevant to the resolution of this or any other criminal case.

## CONCLUSION

This case has been highly publicized. It has garnered an enormous amount of media attention and scrutiny. All of this is understandable, since the case involves a defendant upon whom the death penalty has been imposed for heinous crimes perpetrated upon a small, defenseless child. However, this court has the duty to rule on matters of record and the applicable law, and not be influenced by the opinions or agenda of the media. Further, this court is not afforded the luxury or indulgence to try the case on an *ad hoc* basis. The members of this court cannot act as quasi-jurors to reweigh the evidence in order to decide whether we believe that the defendant is guilty of the crimes charged.

Like the jury, we are bound by the evidence of record and the applicable rules of law. As Justices of the highest court in this State, it is our sworn and solemn duty to apply the law to the facts of record, in order to determine whether there were errors at defendant's trial, and if so, whether those errors so infected the fundamental fairness of the trial that they rendered the jury's decision inherently suspect or palpably erroneous. I am mindful of the grave responsibility of this court in all cases, but particularly in capital cases, to ensure that the defendant's trial was not contaminated by errors which served to deprive him of a fair trial or which could be said to have had a material effect on the verdict. The record in the case at bar does not support a

conclusion that the defendant received a trial that was unfair or infected with substantial error that would justify setting aside the jury's verdict and awarding defendant a new trial. Therefore, defendant's convictions and sentence should be affirmed.